PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3933
_____

UNITED STATES OF AMERICA

v.

CRAIG CLAXTON,
                              Appellant

_____

On Appeal from the District Court
of the Virgin Islands
(D. VI. No. 3-06-cr-00080-009)
District Judge:  Honorable Curtis V. Gomez

_____

Argued on Monday, December 9, 2013
Before:  FISHER, COWEN and NYGAARD, <u>Circuit Judges</u>

(Filed: August 18, 2014)


Susan B. Moorehead, Esq.  **(ARGUED)**
Smock & Moorehead
No. 11A Norre Gade

P.O. Box 1498
St. Thomas, VI 00804

*Counsel for Appellant*


Nelson L. Jones, Esq.  **(ARGUED)**
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
St. Thomas, VI 00802

*Counsel for Appellee*


_____


OPINION OF THE COURT

_____


FISHER, Circuit Judge

Defendant Craig Claxton appeals his conviction and sentence for conspiracy to possess with intent to distribute cocaine from 1999 to 2005, in violation of 21 U.S.C. § 841. The allegations against Claxton and several co-defendants stem from a wide-ranging drug conspiracy involving the importation of large quantities of cocaine from the British Virgin Islands to the Territory of the Virgin Islands and ultimately to the United States mainland.  Claxton raises five challenges to various aspects of the proceedings in the District Court.  We will affirm his conviction and sentence.

I.

This case has a lengthy history involving several co-defendants and multiple appearances before this Court. The case commenced on December 19, 2006, when a federal grand jury returned a fourteen-count indictment charging Claxton in Count One[1] with conspiring to possess with intent to distribute five kilograms or more of cocaine between 1999 and 2005, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii)(II). A warrant was issued that day for Claxton's arrest.

**A.      The first trial and Claxton's arrest**

The first jury trial commenced on September 5, 2007 without Claxton's participation because he had not yet been arrested. Two of Claxton's co-defendants were found guilty during the first trial, and a mistrial was declared as to the remaining co-defendants. Prior to retrial, Swann and Mark appealed the denial of their motion to dismiss the indictment and Mark filed a motion for a stay of the trial. We granted the motion to stay on January 22, 2008, and ultimately affirmed the denial of the motion to dismiss. *United States v. Mark*, 284 F. App'x 970 (3d Cir. 2008). We denied a petition for rehearing *en banc* on August 19, 2008.

While the appeal was pending, Claxton was arrested on April 23, 2008 in Orlando, Florida. He waived his right to a removal hearing pursuant to Federal Rule of Criminal Procedure 5(c)(2), and was ordered transferred to the District of the Virgin Islands on April 25, 2008. On that date he was

---

[1] The indictment also charged Gelean Mark, Vernon Fagan, Walter Ells, Kelvin Moses, Kerry Woods, Henry Freeman, Glenson Isaac, Everette Mills and Dorian Swann.

transported to Guaynabo MDC in Puerto Rico, where he was held until the transfer to the Virgin Islands was completed on July 16, 2008. Claxton was arraigned on July 21, 2008, at which time he entered a plea of not guilty. The District Court ordered his continued detention that same day.

## B.     Proceedings involving Claxton

Claxton moved to dismiss the charge against him on October 23, 2009 on the grounds that the proceedings violated both the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161 ("STA"). At a motions hearing held on March 23, 2010, the District Court denied the motion for relief with respect to the Sixth Amendment, but declined to hear argument on the STA, noting that it would render a written decision based upon the parties' submissions. A review of the record reveals that the District Court never entered a written opinion. Claxton renewed his STA motion on May 20, 2010, which the District Court denied prior to trial.

Claxton also joined in a motion to continue the trial based upon pre-trial publicity on May 14, 2010. The moving defendants objected to having the trial commence two weeks after the completion of a racketeering trial involving Gelean Mark and Police Officer Jerome Blyden (the "Mark/Blyden trial"). That case involved charges of drug dealing, gambling, and dog fighting, and featured the testimony of three cooperating witnesses: James Springette, Elton Turnbull, and Glenson Isaac. Each of those witnesses would ultimately testify in Claxton's case. The motion argued that prejudice stemmed from media reports about the Mark/Blyden trial, even though Mark was ultimately dismissed as a defendant in Claxton's case on May 24, 2010. Counsel for the moving defendants specifically referenced an organizational chart

4

used in the Mark/Blyden trial that was broadcast on a news station and had Claxton's name on it. The District Court denied the motion, stating:

> In the Court's view, voir dire will address the concerns and ensure that we have a jury that can be fair and impartial. Since the touchstone is not whether someone has read something or heard something, but whether they can maintain fairness and impartiality.
>
> I know there has been some concern because Mr. Mark was on trial a few weeks ago with this court. Significantly he is no longer on trial in this court. Also, to the extent that there was publicity, it seems that there was publicity with respect to Mr. Mark. If there was some spillover with respect to other defendants, as counsel indicated this morning . . . the Court will try to address those concerns during voir dire.

App. at 206-07. The defendants also objected to selecting a jury from the same panel of jurors used to select a jury in the Mark/Blyden trial.

## C.    Jury selection and trial

Claxton's trial began on May 24, 2010. During *voir dire*, the District Court inquired into, among other things, whether potential jurors had read or heard anything about the case involving the defendants. Only one juror had. The District Court excused that juror for cause along with another juror who participated in *voir dire* in the Mark trial.

The government presented the testimony of James Springette and Elton Turnbull in its case-in-chief. Springette testified that he had been involved in drug trafficking in the Virgin Islands prior to 1999 and that the alleged conspiracy in Claxton's case began in 1999. Turnbull testified that he managed the collection and distribution of the cocaine after it arrived in the United States. During his testimony, he made reference to numerous letters he had written to the United States Attorney's Offices ("USAO") in North Carolina and the Virgin Islands, other federal law enforcement authorities in North Carolina, and the District Court.

Following Turnbull's direct examination, Claxton and his co-defendants requested copies of those letters. The Virgin Islands USAO provided the defendants with four letters written by Turnbull the next day. After further review, the North Carolina USAO admitted that they had inadvertently overlooked a file containing letters written by Turnbull and immediately faxed those documents to the Virgin Islands USAO. The letters were provided to the defendants on the evening of May 25, 2010, and the corresponding envelopes were provided on May 27, 2010. Upon reviewing the letters, the District Court stated:

> It seems to me with Mr. Turnbull . . . there are three basic things he's concerned with. One is witness protection . . . which is something

I don't think you want the jury to be considering . . . . Two, he wants witness fees for his testimony . . . [a]nd the other thing, which seems to be that he wants to get a Rule 35 . . . But the first and the last thing I mentioned seem to be connected. He says, "I have testified and put myself in great peril . . . I've lost my family . . . I've lost this, I've lost that." And so you are correct, he wants to get a Rule 35. But I haven't yet seen or heard anything from you that says that, "I will testify. Now give me a Rule 35." [Y]ou're going to get to inquire and you're going to get plenty of leeway from the Court, given the timing of this disclosure. But I'm just pointing out to you that . . . in every letter that I have recently just pulled up, it seems that he is saying [the same thing]. I'm not going to do anything that would cause you to prejudice your client's right to a fair defense. So you take as much time as you need [to prepare].

Trial Tr. May 27, 2010 (ECF No. 1137-2), at 106-17. The District Court ultimately permitted the defendants to cross examine Turnbull and Springette regarding the letters.

On May 26, 2010, Juror 125 informed the District Court that she had been approached by an individual who offered her $1,500 to say "nitroglycerin," which she was told meant "not guilty." Juror 125 testified that she knew the person by sight and told the District Court the person's full name. Juror 125 also revealed that she had discussed the event with her brother, sister, and Juror 159. The District Court inquired into these events with Jurors 125 and 159, and received assurances from both that they could remain fair and impartial. The defendants moved for removal of the two affected jurors, or, alternatively, for a mistrial. The District Court denied the motion for a mistrial, but did not rule on the motion to remove. It did, however, sequester the jury from that point forward. Jurors 125 and 159 ultimately did not participate in the jury's deliberations.

During trial the government presented evidence of thirty kilograms of cocaine seized in September 2003 by Immigration and Customs Enforcement at the Cyril E. King Airport in St. Thomas. Isaac testified that the cocaine seized in September 2003 was part of the cocaine importation scheme, that some of that cocaine was intended to be delivered to him, and that Mark advised him of the seizure when it occurred. Isaac testified that after he received the drugs he relied upon female couriers to carry the drug proceeds back to the Virgin Islands. He identified Claxton as a member of the organization whose role was to pick up the female couriers from the airport to transport the money to Mark, after which Claxton would check them into a hotel and make sure the couriers were paid.

## D.    Judgment of acquittal

Claxton moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the

government's case. The District Court expressed concern about the sufficiency of the evidence against Claxton, but reserved judgment on the motion and submitted the case to the jury. Thereafter, the jury found Claxton guilty.

Claxton also sought a new trial pursuant to Federal Rule of Criminal Procedure 33 on the grounds that certain evidence was improperly admitted and that the government had improperly withheld certain documents during trial. On September 24, 2010, Claxton supplemented his new trial motions and requested a hearing pursuant to the Supreme Court decision in *Remmer v. United States*, 347 U.S. 227 (1954). He contended that he learned after trial that one of the jurors, Juror 161, had previously worked at the Virgin Islands Housing Authority with government witness Mark Joseph and failed to disclose this relationship during *voir dire*.

The District Court heard arguments on Claxton's Rule 29 motion on several occasions between the final day of trial and the May 11, 2011 sentencing hearing, at which time the District Court granted the motion. In granting the judgment of acquittal, the District Court failed to address Claxton's outstanding motions for a new trial. The government appealed, and this Court reversed the judgment of acquittal and remanded to the District Court. We held that the evidence was sufficient to establish Claxton's involvement in the charged conspiracy and that Claxton knew he was participating in a criminal enterprise that involved drugs. *United States v. Claxton*, 685 F.3d 300, 301, 313 (3d Cir. 2012).

### E. Sentencing

Following remand, Claxton was sentenced on October 4, 2012. He moved for a downward departure from the

mandatory minimum sentence based upon cooperation he had provided at the government's request in a separate conspiracy case. The District Court denied the motion, and Claxton was sentenced to the mandatory minimum sentence of 120 months' imprisonment. This appeal followed.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and this Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III.

Claxton raises several challenges on this appeal. First, he seeks dismissal of the indictment on the grounds that the delay in bringing him to trial violated both the STA and the Sixth Amendment right to a speedy trial. Second, he asserts his right to a new trial on grounds that: (a) he was denied his Sixth Amendment right to an impartial jury; (b) the District Court improperly admitted certain drug evidence; and (c) he was prejudiced by the government's failure to turn over certain documents in violation of the rules set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Finally, Claxton challenges his sentence insofar as he was denied a sentence below the statutory minimum despite having given information to government investigators in a separate case. We will address each argument in turn, but we first address the issue of waiver.

## A.    Waiver

Waiver is implicated here because the District Court failed to comply with  Federal Rule of Criminal Procedure

29(d) when it entered a judgment of acquittal in Claxton's favor.[2]  Specifically, the District Court never entered a conditional ruling on Claxton's new trial motions based upon the admission of the drug evidence and the alleged *Brady/Giglio* violations.  Claxton never raised the Rule 29 error in his first appeal, nor did he renew the outstanding new trial motions on remand.  We questioned whether Claxton was required to raise the Rule 29 error in a cross-appeal in his first appeal in order to preserve the underlying new trial motions and, if not, whether he had an obligation to renew the new trial motions on remand.  We now conclude that he was not required to file a cross-appeal and will consider the merits of his arguments despite his failure to renew them following remand.

We agree with the parties that Claxton was not required to file a cross-appeal.  *See United States v. Miranda*, 425 F.3d 953, 963 (11th Cir. 2005) (finding that, despite the district court's failure to enter a conditional ruling and the defendant's failure to file a cross-appeal, the district court "ha[d] the authority, upon remand, after reversal of a judgment of acquittal, to consider whether it should grant or deny a motion for a new trial."  *Id.* (citing *United States v. Ward*, 274 F.3d 1320, 1323 (11th Cir. 2001)).  The holding in *Miranda* therefore permits a defendant to renew his new trial motions on remand despite not having filed a cross appeal.

---

[2] Under Rule 29(d), a district court is required to conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed by specifying the reasons for that determination.  Fed. R. Crim. P. 29(d).  Failure to make such a conditional ruling is error.  *See United States v. Wasserson*, 418 F.3d 225, 240 n.10 (3d Cir. 2005).

11

*Id.  See also Ward*, 274 F.3d at 1321 (holding that when a court of appeals reverses a judgment of acquittal, the district court retains authority to grant a new trial provided the appeals court's mandate only addresses the judgment of acquittal).

Unlike the defendant in *Miranda* (who was given an opportunity to raise his new trial arguments on remand) Claxton failed to renew his Rule 33 motions following the first appeal.  As a consequence, the District Court never ruled upon those motions and the government now maintains that those arguments have been waived.  We disagree because Claxton did preserve the arguments in his initial motion for a new trial so they are not, in a strict sense, waived for a failure to raise them at all.  Indeed, the government never raised waiver until we ordered the parties to address it.  In light of the unique procedural posture of this case, we will exercise our discretion and consider the merits of Claxton's appeal by treating the District Court's failure to issue an explicit ruling as an implicit denial of his Rule 33 motion.  *See Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("[I]t is within our discretion to consider an issue that the parties did not raise below.").  In reaching this conclusion, we are guided by two principles.

First, we are unwilling to pin the District Court's error in failing to make a conditional ruling on Claxton, who did timely file a motion for a new trial.  *See United States v. Kellington*, 217 F.3d 1084, 1096 (9th Cir. 2000) (rejecting the government's argument that the defendant should suffer the consequences of the district court's failure to comply with Rule 29(d) and the defendant's failure to raise that error on a prior appeal).  It would be wholly improper to deny Claxton a ruling on his new trial motion simply because the District Court erred in the first place by failing to comply with the

12

dictates of Rule 29(d).  *See Wasserson*, 418 F.3d at 240 n.10 (acknowledging district court error in failing to make a conditional ruling).  The court in *Kellington* acknowledged that "[t]he right to a new trial where the interests of justice so require—a right which antedates the Constitution itself—must weigh in the balance of our construction of Rule 29(d)." 217 F.3d at 1096 n.14 (quoting our decision in *Ogden v. United States*, 112 F. 523, 525 (3d Cir. 1902), for the proposition that "[t]he right to move for a new trial, and to have that motion considered upon the reasons presented for it, is an absolute one, and the granting or refusal thereof does not rest in the discretion of the court.").  Considerations of judicial economy likewise dictate that the ruling should not be delayed merely to give the District Court yet another opportunity to rule on the motions, which would result in further delay and possibly another appeal.

Second, we are guided by decisions of several of our sister courts of appeals that have treated a district court's failure to rule on an outstanding motion as an implicit denial of that motion.  *See e.g., United States v. Jasso*, 634 F.3d 305, 307 n.2 (5th Cir. 2011) (treating a district court's failure to rule on a motion for reconsideration as an implicit denial); *United States v. Depew*, 210 F.3d 1061, 1065 (9th Cir. 2000) (treating a district court's failure to rule on a motion for employment of an expert witness as an implicit denial).  In *Tollett v. City of Kemah*, the Fifth Circuit addressed a new trial motion that remained outstanding on the district court's docket following the entry of the final judgment in that case. 285 F.3d 357, 370 n.* (5th Cir. 2002).  In concluding that it would address the motion on appeal, the court emphasized that "*[d]espite the district court's failure to rule, neither side subsequently requested that it do so*."  *Id.* (emphasis in original).  Likewise in this case, the entry of the Judgment

13

and Commitment order following Claxton's sentencing constituted "the entry of a final judgment or of an order inconsistent with the granting of the relief sought by the motion [for a new trial]." *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). Neither party raised this issue before the District Court and we will treat Claxton's motions as having been implicitly denied and consider them on the merits.

**B.      Speedy Trial Act/Sixth Amendment right to a speedy trial**

Claxton raises two issues with respect to the delay in commencing the trial against him, one under the STA, and the other under the Sixth Amendment. The essence of these challenges is that the time between when he was indicted (December 2006), and the start of his trial (May 2010), violated his statutory and constitutional rights to a speedy trial.

*1.      Speedy Trial Act Violation*

Claxton first challenges the validity of the proceedings against him under the STA. "We exercise plenary review over the district court's construction and interpretation of the [STA] and its provisions regarding excludable time." *United States v. Hamilton*, 46 F.3d 271, 273 (3d Cir. 1995) (citation omitted). The findings of fact to which the District Court applied the STA are reviewed for clear error. *Id.*

The STA generally requires a trial to begin within seventy days of the filing of an information or indictment, or the defendant's initial appearance, whichever last occurs. *Zedner v. United States*, 547 U.S. 489, 497 (2006) (citing 18 U.S.C. § 3161(c)(1)). Violations of the STA require dismissal of the indictment. 18 U.S.C. § 3162(a)(2). The STA recognizes, however, "that criminal cases vary widely

14

and that there are valid reasons for greater delay in particular cases." *Id.* To accommodate this need for flexibility, the STA sets forth periods of time that are excludable from the speedy trial clock. *See* 18 U.S.C. § 3161(h). Relevant to the instant case, § 3161(h)(6) provides for the exclusion of a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). We have observed that, "under this provision, and until severance is granted, 'an exclusion applicable to one defendant applies to all codefendants.'" *See United States v. Novak*, 715 F.2d 810, 814 (3d Cir. 1983) (quoting *United States v. Edwards*, 627 F.2d 460, 461 (D.C. Cir. 1980)), *abrogated on other grounds by United States v. Felton*, 811 F.2d 190, 200 (3d Cir. 1987) (*en banc*); *see also United States v. Arbelaez*, 7 F.3d 344, 347 (3d Cir. 1993). Because Claxton was joined as a defendant with nine other co-defendants pursuant to § 3161(h)(6), any exclusion applicable to his co-defendants will also apply to him.

Claxton contends that 220 days of non-excludable STA time elapsed between his initial appearance and the start of his trial. He points first to the period of time between his initial appearance on July 16, 2008 and a motion filed by one of his co-defendants on August 19, 2008 to continue the trial, which he acknowledges stopped the STA clock. He asserts that, up until that point, thirty-three days of non-excludable time had passed. Claxton also points to the period between January 14, 2009 and July 20, 2009, a 187-day period in which he claims the only motions filed were those requesting a trial date.

With respect to the first period, § 3161(h)(1)(C) provides that delay resulting from interlocutory appeals is considered excludable time. *See* 18 U.S.C. § 3161(h)(1)(C).

15

Claxton's co-defendants appealed the denial of their motions to dismiss on January 21, 2008. We affirmed the District Court's decision on July 9, 2008 and, on July 23, 2008, the defendants filed a petition for rehearing *en banc*. Those petitions were denied by order dated August 19, 2008. Therefore, the only time for which Claxton could plausibly claim non-excludable time was between the date of his initial appearance or arraignment and the date his co-defendants filed their petitions for rehearing—which amounts to only seven days.[3]

The second period of time occurred between January 14, 2009 and July 20, 2009. During that time, Claxton argues that 187 days passed during which the only motions filed were those requesting a trial date. A review of the record, however, reveals that much more actually occurred. During that time, there were numerous emergency motions filed by his co-defendants requesting extensions of time to file responses and objections to pre-sentence reports, notices of unavailability, motions to continue status conferences, requests for hearings, and even a motion to extend the time to file pretrial motions. *See generally* Dist. Ct. Docket, ECF Nos. 717-72. These motions served to toll the speedy trial clock for all defendants until the District Court held a hearing on the motions. *See* 18 U.S.C. § 3161(h)(1)(D) (tolling of STA clock occurs during time between filing of a pretrial motion and the required hearing on that motion); *see also*

---

[3] Claxton claims that his speedy trial clock began to run from the date of his initial appearance on July 16, 2008, while the government argues that the clock did not begin to run until July 21. For purposes of STA calculations, however, this dispute has no bearing on the outcome because the five days at issue are not sufficient to find a STA violation.

*United States v. Tannehill*, 49 F.3d 1049, 1052 n.4 (5th Cir. 1995) (finding that where defendants requested a hearing, it was unnecessary to determine whether the hearing was "required" for STA purposes). The record reveals that the District Court conducted a hearing on at least some of these motions at the moving defendants' request on October 7, 2009, at which time the District Court set a date for trial. The intervening time, therefore, was excludable under the STA. *See Henderson v. United States*, 476 U.S. 321, 326 (1986) ("The plain terms of the [STA] appear to exclude all time between the filing of and the hearing on a motion whether that hearing was prompt or not."). Given the complexities of the case, the number of defendants, and the logistics of bringing so many defendants to trial, we cannot say, based upon the record as a whole, that Claxton has demonstrated a violation of his speedy trial rights under the STA.

2.     *Sixth Amendment speedy trial right*

Claxton argues that his Sixth Amendment right to a speedy trial was violated by the government's delay in bringing him to trial. We exercise *de novo* review over legal questions in a claim of Sixth Amendment error and review the underlying factual findings for clear error. *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014).[4]

The Supreme Court decision *Barker v. Wingo*, 407 U.S. 514 (1972), set forth a four-factor test that courts use to

---

[4] On April 22, 2014, we ordered the parties to file letter briefs addressing the impact of our recent decision in *Velazquez* on Claxton's Sixth Amendment argument. As we discuss below, we find *Velazquez* to be distinguishable and will affirm the District Court's conclusion that no Sixth Amendment violation occurred.

examine alleged Sixth Amendment violations. "The inquiry focuses on: (1) the length of the delay before trial; (2) the reason for the delay and, specifically, whether the government or the defendant is more to blame; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant." *Velazquez*, 749 F.3d at 174 (citing *Barker*, 407 U.S. at 530-31). No single factor in the *Barker* calculus is "'talismanic.'" *Id.* (quoting *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993)). "[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31. Thus, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531.

*Velazquez* reaffirmed the need to apply the factors set forth in *Barker* when addressing alleged Sixth Amendment speedy trial violations and involves facts that are somewhat analogous to this case. Velazquez was being investigated by the Drug Enforcement Administration ("DEA") in Philadelphia for suspected trafficking in cocaine. 749 F.3d at 168. Velazquez (who lived in California) and his co-defendants were indicted on August 2, 2005, and a warrant was issued for Velazquez's arrest shortly thereafter. *Id.* Over the next five years, investigators did little more than occasionally run Velazquez's name through the National Crime Information Center ("NCIC") database. *Id.* at 170-71. It was not until nearly six-and-a-half years later that Velazquez was apprehended on an unrelated narcotics charge and was returned to Philadelphia to face trial for the charges alleged in the 2005 indictment. *Id.* at 173.

Velazquez sought to dismiss the indictment on Sixth Amendment speedy trial grounds, and the district court

denied the motion. *Id.* The court concluded that because the government felt that it was unlikely to locate the defendant, it reasonably conserved its resources and waited for further information before pursuing its investigation. *Id.* We reversed after analyzing each of the *Barker* factors and concluding: (1) the length of delay triggered the need to analyze all four factors; (2) the government was not reasonably diligent in pursuing its investigation; (3) Velazquez was diligent in asserting his speedy trial rights; and (4) the government failed to overcome the general presumption of prejudice that arises in cases of excessive delay. *Id.* at 174-86. In weighing all the factors, we concluded that the delay violated Velazquez's constitutional right to a speedy trial, and that dismissal of the indictment was required. *Id.* at 186.

The parties here dispute whether *Velazquez* controls the outcome in the present case. We will consider its relevance along with each of the *Barker* factors, below.

Length of delay

The threshold question under *Barker* is whether the length of delay was sufficient to trigger analysis of the remaining factors. This involves "a double enquiry." *Doggett v. United States*, 505 U.S. 647, 652 (1992). "In other words, a court first decides whether the delay is long enough that it should trigger analysis of the other *Barker* factors. . . . If it is, the length of the delay is also separately weighed in the court's analysis of the remaining factors." *Velazquez*, 749 F.3d at 174 (citations omitted). The length of delay is

measured "from the date of arrest or indictment, whichever is earlier, until the start of trial." *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009) (citing *Hakeem*, 990 F.2d at 760). "We have previously held that a delay of even fourteen months is sufficient to trigger review of the remaining *Barker* factors. *Id.* (citing *Hakeem*, 990 F.2d at 760).

In the present case, both parties concede that review of the remaining factors is necessary because the period of time between Claxton's indictment and trial sufficiently exceeds the fourteen-month threshold recognized in *Hakeem*. This factor will therefore weigh in Claxton's favor. *Velazquez*, 749 F.3d at 174.

The reason for the delay

The government bears the burden of justifying the delay in bringing a defendant to trial. *Battis*, 589 F.3d at 680 (citing *Hakeem*, 990 F.2d at 770). "In evaluating this factor, we subtract the amount of delay caused by the defendant from the delay caused by the Government." *Id.* (citing *United States v. Dent*, 149 F.3d 180, 184-85 (3d Cir. 1998)). In *Battis*, we set forth the three categories of delay and the resulting weight each carries against the government: (1) "A deliberate effort by the Government to delay the trial in order to hamper the defense weighs heavily against the government;" (2) "A more neutral reason such as negligence or overcrowded courts also weighs against the Government, though less heavily;" and (3) "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* at 679 (internal quotation marks and citations omitted). "By contrast, delay caused by the defense weighs against the defendant." *Id.* at 680 (internal quotation marks omitted).

This case presents a sparse record from which to determine which party has captured "the 'flag all litigants

20

seek.'" *Velazquez*, 749 F.3d at 175 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). Despite the shortcomings, the delay caused by the defendants in this case dramatically reduces the length of the delay we must consider for purposes of this element. Claxton's trial commenced in May of 2010, twenty-two months after his arraignment in the District of the Virgin Islands in July of 2008. As discussed above, however, that delay was excusable as a result of the myriad motions and appeals filed by Claxton and his co-defendants. Such excusable delay is subtracted from the delay attributable to the government. *See Battis*, 589 F.3d at 680. The remaining delay—the nineteen months between the indictment in December 2006 and Claxton's initial appearance in July 2008—is more than offset by the twenty-two month post-appearance delay that is attributable to the defendants.

The nineteen-month delay attributable to the government, moreover, is also likely justified in light of the record in this case. At Claxton's initial appearance on July 16, 2008, the government's witness testified that information obtained by government agents indicated that Claxton could be found in Orlando, Florida, and that agents ultimately arrested him there pursuant to a warrant. The government witness at Claxton's subsequent arraignment and detention hearing observed in response to a question about Claxton's residence that: "Mr. Claxton used to reside in St. Thomas. As of 2005, it's been unclear exactly where Mr. Claxton resides. Otherwise, I think we'd have picked him up." App. at 86-87. Our review of the record reveals that none of the grounds outlined in *Battis* appears to be implicated in this case such that this period should weigh against the government. 589 F.3d at 679-80. Under the circumstances presented here, it appears as though the government promptly acted upon

21

information it obtained in the course of its investigation and arrested Claxton when it discovered his whereabouts.

More important, however, is the fact that this case is easily distinguishable from *Velazquez*. That case involved an extensive record of less than enthusiastic government pursuit. As we pointed out in *Velazquez*, almost five years elapsed during which investigators input Velazquez's name into the NCIC database *only eight times*. 749 F.3d at 180. The government conceded that it had made a "tactical choice" to pursue other leads during that time, and to essentially ignore Velazquez. *Id.* at 176-78. This case simply does not reflect the complete "lack of effort by law enforcement authorities" at issue in *Velazquez* for four reasons. *Id.* at 178. First, the investigatory period was far shorter—less than two years in Claxton's case as opposed to more than five years in *Velazquez*. Second, Claxton's case involved a complex international drug-smuggling operation as opposed to the more straightforward domestic drug trafficking scheme in *Velazquez*. *See* 749 F.3d at 167-68 (outlining the conduct at issue in that case). Third, *Velazquez* did not involve the type of delay attributable to the defendants that occurred in Claxton's case—delay that offsets any delay attributable to the government. Finally, the break in Claxton's case was the result of police work—he was arrested after investigators followed up on his attempts to obtain a passport—as opposed to Velazquez, who was arrested on an unrelated controlled substance charge. These facts, combined with the substantial delay attributable to the defendants in this case, demonstrate that the government has met its burden of justifying any delay that occurred. *See Barker*, 407 U.S. at 530-31 (noting that delay for Sixth Amendment purposes is dependent upon the facts of the individual case). This factor will, therefore, weigh in the government's favor.

22

Defendant's assertion of the right

The third factor in the *Barker* analysis is the degree to which the defendant asserts his speedy trial right, "including 'the frequency and force' of such assertions." *Velazquez*, 749 F.3d at 183 (quoting *Barker*, 407 U.S. at 529). The parties both concede that Claxton has repeatedly asserted his speedy trial rights. This factor therefore weighs in his favor.

Prejudice suffered by the defendant

The final consideration in the *Barker* analysis is the prejudice suffered by the defendant. The *Doggett* Court identified three types of harm that arise from unreasonable delay between formal accusation and trial: (1) "oppressive pretrial incarceration;" (2) "anxiety and concern of the accused;" and (3) "the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." 505 U.S. at 654 (internal quotation marks omitted) (alteration in original). The *Doggett* Court also acknowledged that excessive delay can lead to a presumption of prejudice, but added that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 655-56. *See also id.* at 657 (noting that "to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.").

Claxton claims both presumptive prejudice and actual prejudice stemming from the delay in bringing him to trial. We first find that no presumption of prejudice exists in this case. In total, less than three-and-a-half years elapsed between Claxton's indictment and the start of his trial. Of that time, however, only nineteen months are attributable to

governmental delay in apprehending Claxton and bringing him before the District Court. That is not substantially more than the fourteen-and-a-half months of *pretrial incarceration* at issue in *Hakeem*. 990 F.2d at 771 (declining to find that a fourteen-and-a-half month period of pretrial incarceration was *per se* oppressive or prejudicial). Claxton was, of course, free during that entire period and by his own admission was unaware of the charges pending against him such as would cause anxiety or concern. *See* Claxton Ltr. Br. May 2, 2014, at 5. *Doggett* and *Velazquez* are also distinguishable from the present case, as those cases involved eight-and-a-half years (*Doggett*) and more than five years (*Velazquez*) of pre-arrest delay, as well as findings that the government's efforts in apprehending the defendants were negligent at best. *See Doggett*, 505 U.S. at 657; *Velazquez*, 749 F.3d at 184-86.

The post-arrest delay in this case was also not prejudicial because it was largely caused by the number of defendants, the extensive motions practice and the delay resulting from the appeals undertaken in this complex and large-scale drug conspiracy prosecution. *See Barker*, 407 U.S. at 531 (acknowledging that longer delays are tolerable based upon the seriousness or complexity of a particular case). We therefore conclude that the delay at issue in the present case does not rise to the level of presumptively prejudicial.

Claxton next argues that he suffered specific prejudice stemming from the eighty-four day period that he was held in Puerto Rico prior to being brought before the District Court. He characterizes this period as "oppressive pretrial incarceration" that rose to the level of a Sixth Amendment violation. We have held that a finding of prejudice based upon oppressive pretrial incarceration cannot be premised upon even seven months of pretrial incarceration, "absent [a

showing of] substandard conditions." *Hakeem*, 990 F.2d at 760 (citing *Wells v. Petsock*, 941 F.2d 253, 257-58 (3d Cir. 1991)). Claxton has given no indication that he faced substandard conditions as compared to those generally associated with the transfer of prisoners, nor has he identified any decision finding that a two-and-a-half month delay constitutes oppressive pretrial incarceration. *See id.* (seven-month delay insufficient to be prejudicial).[5]

Because we conclude that Claxton neither suffered from a presumption of prejudice nor has he identified a specific occurrence of prejudice, the final *Barker* factor weighs in the government's favor.

In weighing the *Barker* factors, we note that the reason for the delay and the prejudice factors both weigh in the government's favor. These factors certainly carry a great deal of weight insofar as they relate to the substantive facts of the case. We do acknowledge, however, that Claxton did assert his speedy trial rights and that the delay was sufficient to trigger the *Barker* analysis. Nevertheless, the fact remains that much of the delay at issue in this present case was attributable to his co-defendants' own conduct, and Claxton has not shown either presumed or actual prejudice. In light of these facts, we conclude that the balance weighs in favor of

---

[5] Claxton's reliance upon the STA is equally unavailing. He asserts that the eighty-four day delay was prejudicial because it "exceed[ed] the 70 day limit contemplated by the [STA]." Claxton Ltr. Br. May 2, 2014, at 7. As he is forced to concede, however, time during which a defendant is being transferred between districts is excluded from consideration for STA purposes, and this argument is, therefore, a *non sequitur*.

the government, and Claxton has not demonstrated a Sixth Amendment speedy trial violation.

## C.     Sixth Amendment right to an impartial jury

Claxton seeks a new trial on the basis that his Sixth Amendment rights were violated when he was deprived of the right to a fair and impartial jury. "We analyze [a] defendant's claims of lack of an impartial jury by conducting an independent review of the *voir dire* of the empaneled [sic] jurors to determine whether [the defendant] has demonstrated that 'substantial prejudice' arose from the publicity." *Gov't of Virgin Islands v. Riley*, 973 F.2d 224, 226 (3d Cir. 1992) (quoting *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir. 1991)). Our review of a district court's investigation of juror misconduct, as well as its denial of a mistrial, is for abuse of discretion. *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993). Claxton asserts three grounds for this alleged violation: (1) pretrial publicity; (2) jury tampering; and (3) juror misconduct. We address each argument below.

### *1.     Pretrial publicity*

Claxton first argues that the publicity surrounding the Mark/Blyden trial, which concluded two weeks prior to the Claxton trial and involved an organizational chart that listed Claxton's name as well as those of his co-defendants, was so prejudicial that he was denied a fair and impartial trial. Our review of the record has revealed no evidence that Claxton's trial was prejudiced by pretrial publicity.

The Sixth Amendment guarantees the right to a trial by a fair and impartial jury. *United States v. Jones*, 566 F.3d 353, 358 (3d Cir. 2009). Therefore, a conviction may be overturned if a defendant's "trial atmosphere was so pervaded by publicity that no jury could be empaneled [sic] which did not have a preconceived determination of guilt." *Riley*, 973

F.2d at 226 (citing *Irwin v. Dowd*, 366 U.S. 717 (1961)). The Supreme Court has cautioned, however, that the "relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984) (rejecting fair trial argument even though pretrial publicity revealed defendant's previous murder confession and his plea of temporary insanity). Therefore, "'[p]retrial publicity exposure will not automatically taint a juror.'" *Riley*, 973 F.2d at 227 (quoting *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir. 1980)). Even in instances where a "'juror has heard of or about the case and of the allegations of a defendant's guilt, he may sit if he is still capable of abandoning his prior impressions and rendering a fair verdict on the evidence.'" *Id.* (citing *Provenzano*, 620 F.2d at 995-96 (rejecting a fair trial argument based upon jury members' knowledge of certain terms such as "Mafia," "gangster," and "organized crime" used in the media to refer to the defendant's case)). The Supreme Court aptly summarized: "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Skilling v. United States*, 561 U.S. 358, 384 (2010).

In Claxton's case, the District Court took great pains during the *voir dire* process to ensure that it eradicated any potential prejudice stemming from the earlier Mark/Blyden trial. Specifically, the District Court asked the venire panel: "Have any of you read, or heard anything about this case involving those Defendants? If so, raise your card. . . . 176. All right. All right." App. at 222. Upon further examination, the District Court established as follows:

27

THE COURT: You indicated you had read something about this case?

JUROR 176: Yes.

THE COURT: Tell us what your source was.

JUROR 176: I read The Daily News, the Judge report, and dem man say every day, and I'm pretty sure I read something about a large trafficking case, and there were a lot of other people implicated that were still left to go to trial.

THE COURT: All right. Your duty as a juror is to be fair and impartial as you listen to the evidence, and to follow my instructions on the law. Is there anything that you have read or seen or heard that would prevent you from listening to the evidence in this case fairly and impartially?

JUROR 176: I think I know one of the Defendants, and I know him to be a drug dealer, but I can't tell you how that relationship or when I met him before.

THE COURT: I'm sorry. You said who?

> JUROR 176: One, Mr. Moses, I know to be a drug dealer, but I can't tell you how I know that. I just seen him on the street when I worked at my other job.
>
> THE COURT: All right. Thank you.

App. at 225-26. Juror number 176 was ultimately excused by the Court for cause. The District Court also excused for cause the one juror who attended *voir dire* in the Mark/Blyden trial. None of the other potential jurors participating in *voir dire* in this case expressed any knowledge of the prior trial. Absent such knowledge, we cannot say that the jury was unfairly tainted in Claxton's case.

Even if other jurors had been aware of the prior trial (although the record is devoid of such evidence), the District Court further protected against potential prejudice by instructing the jurors that the defendants were to be presumed innocent until the government was able to prove each defendant's guilt beyond a reasonable doubt, and the jurors were instructed to decide the case based solely on the evidence presented in the courtroom, disregarding anything that they may have seen or heard prior to trial. These instructions provided a further level of insurance against prejudice. *See Riley*, 973 F.2d at 227 (relying, in part, on district court's instructions in finding no prejudice). Jurors are presumed to follow the instructions they are given, and Claxton offers no evidence to rebut that presumption. *E.g., Penry v. Johnson,* 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."). Because nothing in the record indicates that the jurors who were

ultimately impaneled had already determined Claxton's guilt, or that they could not maintain an open mind in determining his guilt based upon the evidence presented at trial, Claxton's Sixth Amendment claim with respect to pretrial publicity fails.

### 2. *Jury tampering*

Claxton next argues that he was denied a fair and impartial jury as a result of the unauthorized contact with Juror 125, who in turn discussed that contact with Juror 159. We conclude that the District Court did not abuse its discretion by denying Claxton's motion for a mistrial because it conducted a thorough examination of both jurors, sequestered the jury for the remainder of the trial, and ultimately excluded both jurors from deliberations.

"'It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the fullest extent practicable from extraneous influences that may subvert the fact-finding process.'" *United States v. Bertoli*, 40 F.3d 1384, 1393 (3d Cir. 1994) (quoting *Waldorf v. Shuta*, 3 F.3d 705, 709 (3d Cir. 1993)). In this regard, "'any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial.'" *United States v. Vega*, 285 F.3d 256, 266 (3d Cir. 2002) (quoting *Remmer*, 347 U.S. at 229). This presumption is not conclusive, however, and the district court should conduct a hearing in the defendant's presence, at which the government has the burden of proving that the communication did not and will not prejudice the defendant. *Id.* A district court has the sound discretion to conduct the hearing as it sees fit, but it "must conduct a *voir dire* of *all jurors with whom the improper communication occurred* that is sufficiently tailored

to probe adequately the possibility of prejudice." *Id.* (emphasis added).

Claxton argues that the District Court had a duty to conduct a *Remmer* hearing of the entire jury after it learned of the improper contact with Juror 125.[6] This is simply incorrect—*Vega* and *Remmer* instruct that courts need only hear from those jurors to whom the improper communication was made. *Id.* That occurred in this case insofar as Jurors 125 and 159 indicated that they only discussed the incident with each other (along with some family members) and not with any other jurors. Claxton speculates that one of the affected jurors might have been lying when asked if they had talked to other jurors, but provides no basis in the record for

---

[6] Claxton relies upon the Ninth Circuit's decision in *United States v. Angulo* in making this argument. 4 F.3d 843 (9th Cir. 1993). In that case, a juror was threatened in a phone call and she promptly told all the remaining jurors about the call. *Id.* at 846. The district court in that case had to examine the entire jury panel because the threat "was communicated to the other jurors." *Id.* at 847. *Angulo* is thus distinguishable because such communication to the entire jury panel did not occur in this case.

arriving at such conclusion.[7]  The District Court, which was in the best position to judge the jurors' credibility, examined the jurors and found their testimony to be credible and consistent.  The District Court thus did not abuse its discretion in concluding that further *voir dire* was unnecessary.

The record also demonstrates that the District Court conducted a sufficiently thorough investigation and properly concluded that Claxton suffered no prejudice.  As required by this Court's decision in *Vega*, the District Court questioned the affected jurors about their ability to remain fair and impartial and both reported that they could.  The record also reveals other objective evidence of the jurors' ability to remain impartial.  *See Vega*, 285 F.3d at 267 (requiring courts to look beyond a potentially tainted juror's subjective assessment of their impartiality).  Juror 125 was extremely candid about the improper contacts and answered all of the District Court's questions in a way that it found to be believable.  Her candor is reflected by the admission that she

---

[7] Claxton points to Juror 125's testimony at a subsequent trial as being inconsistent with what she reported to the District Court in Claxton's case.  This effort to impugn Juror 125's testimony is of little consequence.  The District Court was in the best position to determine whether the jurors were credible, and found them to be so.  Nothing about Juror 125's subsequent testimony, even if it was inconsistent, reveals that she told any of the other jurors about her encounter during the Claxton trial.  Under an abuse of discretion standard, we will not second-guess the District Court's determination, particularly where it turns on a credibility finding that is not contradicted by the record before it.  *See United States v. Pungitore*, 910 F.2d 1084, 1140 (3d Cir. 1990).

did, in fact, discuss the contacts with Juror 159 and other family members. Juror 159 was likewise the person who told Juror 125 to report the improper contacts to the District Court—thus demonstrating her willingness to follow its instructions. Finally, we note the most critical insurance against prejudice in this case—the fact that neither Juror 125 nor 159 actually participated in the jury's deliberations. In light of these facts, we cannot conclude that the District Court abused its discretion in addressing the juror tampering issue.

### 3. *Juror misconduct*

Claxton's final argument is that the District Court erred in failing to grant a new trial despite his allegations that a juror concealed a prior work relationship with a government witness. Specifically, Claxton alleged that Juror 161 failed during *voir dire* to disclose that he had previously worked at the Virgin Islands Housing Authority with government witness Mark Joseph and defense witness Calford Charleswell.[8] The District Court never ruled on this motion, and no hearing was held. We therefore treat the motion as having been implicitly denied. *See* Section III.A., *supra*.

"A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). In

---

[8] We note that Claxton was not so vociferous in pointing out the potential bias in *his* favor based upon the fact that Juror 161 also worked with Mr. Charleswell, who was a witness for co-defendant Woods.

order to obtain a new trial on the basis of false juror testimony, a party must establish: (1) that the "juror failed to answer honestly a material question on *voir dire*;" and (2) "that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.

Because the District Court failed to conduct a hearing with respect to Claxton's assertions about Juror 161's past employment relationship with the government witness, we will presume that the allegations are true—i.e. that Juror 161 failed to honestly answer the Court's *voir dire* questions about knowing witnesses—and consider whether the second prong is met. At the outset, we note that the District Court did not commit an error of law insofar as the law "does not categorically impute bias to coworkers of key Government witnesses." *United States v. Mitchell*, 690 F.3d 137, 150 (3d Cir. 2012) (declining to find implied-in-law bias when a juror was a coworker of police officers who testified in a criminal trial). Claxton has likewise failed to demonstrate any basis for finding actual prejudice. His assertions establish only that, at some unspecified time in the past, Juror 161 worked with both a government and defense witness. The motion does not indicate that Juror 161 actually knew either of the witnesses, nor does it indicate any possible basis for bias beyond having shared a former employer. We cannot say that the District Court abused its discretion in implicitly finding that this was not a basis for a challenge for cause.

Moreover, Claxton's allegations also fail to rise to the level of "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred" such that a hearing was necessary. *United States v. Stewart*, 433 F.3d 273, 302-03 (2d Cir. 2006) (internal quotation marks omitted). He offers nothing more than speculation that Juror 161even knew the witnesses, much less

34

that the juror was biased in the government's favor—particularly when Juror 161 also worked with a defense witness. Absent such a showing, and in light of the Supreme Court's admonition that we should not "wipe the slate clean simply to recreate the peremptory challenge process," *McDonough*, 464 U.S. at 555, we conclude that the District Court did not abuse its discretion in implicitly denying Claxton's motion and for not holding a hearing.

## D. Drug evidence

Claxton argues that the District Court abused its discretion when it admitted evidence related to the September 2003 drug seizure because the evidence was highly prejudicial, irrelevant to the charged conspiracy, and was not probative with respect to the charges against him. He maintains that there was no connection drawn between the drug evidence and the charged conspiracy. We review the District Court's decision to admit that evidence for an abuse of discretion. *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006). "[T]o the extent the District Court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, the standard of review is plenary." *Id.*

Federal Rule of Evidence 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403 creates a presumption of admissibility. *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002). When weighing the Rule 403 factors, courts "must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant." *Gov't of Virgin Islands v. Archibald*, 987 F.2d

180, 186 (3d Cir. 1993) (internal quotation marks omitted). Evidence should not be excluded under Rule 403 "merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value. . . . [W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *Cross*, 308 F.3d at 323 (quoting Fed. R. Evid. 403).

The drug evidence at issue here (which included photographs and physical evidence of the seized drugs) was highly probative of the government's case and relevant to establishing the overall drug conspiracy with which Claxton was charged. The government established the connection between the drug evidence and the conspiracy through Glenson Isaac, who testified about his participation in the conspiracy with Mark and about his expectation that he would receive a shipment of five kilograms of cocaine in September 2003. He did not receive that shipment, however, because according to Mark, the drugs "were seized [at] the [Cyril E. King] airport." Supp. App. at 12. From this testimony, it can be reasonably inferred that the drugs admitted into evidence were the same drugs that Isaac expected to obtain. Isaac further testified that Claxton "was a member of the organization." Supp. App. at 14-15. Based upon this testimony, the drug evidence was highly relevant to establishing both the existence of a conspiracy and Claxton's involvement in it, both of which the government had the burden of proving in order to obtain the conviction.

The evidence was also highly probative of Claxton's involvement in the conspiracy despite his arguments to the contrary. He maintains that the seized drugs were related to a separate conspiracy based upon inconsistencies in the way the drugs were transported and in the testimony from government

36

witnesses. Despite these inconsistencies—which go to the weight of the evidence and not its admissibility—the fact remains that the drugs, along with Isaac's testimony, provided crucial circumstantial evidence of the existence of the conspiracy and Claxton's role in it. *See United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (drug evidence necessary to impute knowledge of a drug conspiracy to co-conspirators); *Claxton*, 685 F.3d at 308 (affirming Claxton's conviction on sufficiency of the evidence grounds and relying upon *Boria*). In light of the probative value of the drug evidence at issue here, we conclude that its value substantially outweighed any possible prejudice to Claxton and that the District Court did not abuse its discretion in allowing its admission.

### E. *Brady/Giglio* evidence

Claxton argues that he is entitled to a new trial based upon alleged violations of the rules in *Brady*, *Giglio*, and the Jencks Act, 18 U.S.C. § 3500.[9] He identifies two categories of letters that were allegedly not disclosed by the government and contain information that could have been used to impeach key government witnesses. The first category involved twenty-eight letters sent by Turnbull and Springette to various government officials, including federal agents, the District Court, and several government attorneys (the "Turnbull and Springette Letters"). Claxton sought these letters on the

---

[9] Although Claxton alludes to the Jencks Act, his evidentiary argument focuses solely on the *Brady* issue. To the extent that he attempts to assert the Jencks Act as a basis for a new trial, that argument is waived. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("It is also well settled . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.").

ground that they revealed Turnbull's and Springette's belief that their sentences would be shortened as a result of their cooperation. These letters were disclosed during Claxton's trial, and defense counsel was given the opportunity to cross examine Springette and Turnbull about the contents. The second category involved letters exchanged between Turnbull and Isaac (the "Isaac Letters"), which had been the subject of questioning during an earlier trial but were never turned over by the government at Claxton's trial. Claxton's counsel did, however, utilize the earlier testimony when questioning government witnesses about the Isaac Letters. The letters discussed Turnbull and Isaac's plan to "put a case" against an individual in an effort to take focus off another co-conspirator.

*Brady* and *Giglio* claims involve mixed questions of law and fact, and as such, we review the questions of law *de novo* and the district court's factual findings for clear error. *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).

*Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A successful *Brady* claim, therefore, consists of three elements: "(1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "We do not . . . automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed

evidence possibly useful to the defense but not likely to have changed the verdict.'" *Id.* (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968)). A new trial is only warranted when "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Id.*

Claxton's *Brady* argument with respect to the Turnbull and Springette Letters is necessarily limited, of course, by the fact that the government provided the letters to the defense. The District Court permitted additional cross examination of both witnesses, giving counsel "plenty of leeway" to impeach the witnesses and as much time as counsel needed to prepare. Trial Tr. May 27, 2010, at 114, 117. To the extent that the jury heard the additional cross examination made with the benefit of the letters, therefore, Claxton cannot argue that the evidence was suppressed or that it was material to the issue of guilt because he ultimately used those materials at trial. *See United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987) ("Where the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened.").

Instead, Claxton argues that he was prejudiced by the government's intentional suppression of the materials and that dismissal of the indictment is the appropriate remedy. In *Fahie v. Government of the Virgin Islands*, we held that "dismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct . . . where a defendant can show both willful misconduct by the government, and prejudice." 419 F.3d 249, 254-55 (3d Cir. 2005). We are not persuaded by Claxton's argument that this case presents an opportunity to impose the "rare sanction" of dismissal. *Id.* at 254.

Claxton offers no record evidence demonstrating that the government in this case willfully withheld the Turnbull and Springette Letters. Indeed, the letters were promptly turned over during trial once they were located by the various government agencies, all in time for Claxton to conduct cross examination using the materials. Although the government did initially fail to promptly turn these letters over to Claxton at the appropriate time, we cannot conclude that this delay was willful or that it impacted Claxton's due process rights, and we thus reject Claxton's *Brady* argument with respect to the Turnbull and Springette Letters.

We also reject Claxton's contention that he was unable to obtain the Isaac Letters. In essence, his argument appears to be little more than an attempt to manufacture a *Brady* claim despite his failure to obtain the material by other means. In *Perdomo*, we recognized that "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." 929 F.2d at 973 (citing *United States v. Torres*, 719 F.2d 549 (2d Cir. 1983)). Here, Claxton's examination of Isaac demonstrated counsel's knowledge of the "essential facts" of the Isaac Letters, and touched on many of the points counsel believed to be relevant to that examination.

Moreover, counsel's examination was undertaken using the transcript from the 2007 trial, in which Mark's counsel conducted cross examination using the letter itself—thus indicating that Mark's counsel possessed the letter and that it was available to Claxton's counsel independent of the government. Contrary to Claxton's assertion, therefore, it appears as though he could have obtained the Isaac Letters from a co-defendant's counsel. This would have obviated the need for the government to turn it over. In light of these

40

facts, it is Claxton who must bear the burden of his failure to "'diligently seek . . . discovery.'" *U.S. v. Dula*, 989 F.2d 772, 775 n.9 (5th Cir. 1993) (quoting *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985)). We therefore conclude that the District Court's implicit denial of Claxton's claimed *Brady* violations was proper.

**F.      Safety valve relief**

Claxton's final contention is that the District Court erred in finding that he did not qualify for safety valve relief as provided in United States Sentencing Guidelines ("U.S.S.G.") § 5C1.2. We exercise plenary review over a district court's interpretation of the sentencing guidelines, but we may reject the court's underlying factual findings only on a showing of clear error. *United States v. Sabir*, 117 F.3d 750, 752 (3d Cir. 1997).

The safety valve provision in § 5C1.2 provides that a district court may disregard an otherwise applicable statutory mandatory minimum sentence in certain drug crimes, provided that the five factors set forth in 18 U.S.C. §§ 3553(f)(1)-(5) are met. U.S.S.G. § 5C1.2(a). The parties only dispute the applicability of the fifth factor in this case, which permits a district court to impose a sentence "without regard to any statutory minimum sentence," provided that:

> [N]ot later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that

41

the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

*Id.*

Claxton raised the applicability of § 5C1.2 at the sentencing hearing, at which time he submitted evidence of a proffer session held with investigators with respect to a separate investigation targeting corruption in the Virgin Islands Police Department. The evidence adduced at sentencing demonstrated that Claxton was questioned for approximately forty-five minutes primarily about his knowledge of alleged dog fighting activities. The investigators did question Claxton about whether he had ever seen Mark or Blyden at any of the dog fights, but asked nothing about the drug conspiracy with which Claxton was charged, nor did Claxton independently offer any information about that crime. At the end of the proffer session, the investigators met privately for approximately ten minutes, at which time they returned and informed Claxton that "'[they] ha[d] no use for [him].'" App. at 486.

Claxton maintains that the proffer session was sufficient to meet the requirements of the fifth element of § 5C1.2; thus rendering him eligible for safety valve relief. We disagree. To be eligible for such relief, Claxton must have shown that he "provided to the Government *all information and evidence [he had] concerning the offense or offenses that were part of the same course of conduct or of a common*

42

*scheme or plan*" as the charged offense.  U.S.S.G. § 5C1.2(a)(5) (emphasis added).  Such a showing "requires the defendant to reveal a broader scope of information about the relevant criminal conduct to authorities."  *Sabir*, 117 F.3d at 753.  Claxton bears the burden of establishing that each element of the safety valve criteria applies by a preponderance of the evidence.  *Id.* at 754.

The District Court noted at sentencing that:

> [E]ven if the questions were propounded in the manner that the defense recollects, and the defendant answered those questions, if those questions have no bearing on the offense that's being charged or related offenses, it seems that it doesn't obviate the need for the defendant still to do as the statute requires, which is to share with the government all information and evidence that the defendant has concerning the offense or offenses that were part of the same scheme.

App. at 508-09.  A review of Claxton's affidavit reveals that the dog fighting activities he discussed at the proffer session do not appear to be related to the drug trafficking offense for which he was charged.  To the extent that he was asked about co-defendants Mark and Blyden, Claxton could only report having seen Mark at the dog fights.  Based upon Claxton's recollection, there was no questioning about the drug conspiracy whatsoever.  On these facts, we cannot say that

43

Claxton has met his burden of demonstrating by a preponderance of the evidence that he provided "*all information*" he had regarding the drug trafficking conspiracy. U.S.S.G. § 5C1.2(a)(5) (emphasis added). The mere fact that the investigators did not ask the "right" questions for purposes of Claxton's safety valve claim did not relieve him of his burden under the safety valve provision. The District Court did not err in concluding the same, and we will affirm its decision.

IV.

For the reasons set forth above, we will affirm Claxton's conviction and sentence.

COWEN, *Circuit Judge*.

I write separately because I believe that Claxton failed to preserve his Sixth Amendment challenge for our consideration, and I would not reach the merits of that issue. I join the majority's opinion in all other respects.

I would conclude that Claxton failed to preserve his Sixth Amendment challenge because he failed to adequately compose the record. On March 23, 2010, the District Court orally denied his motion to dismiss on Sixth Amendment grounds. The transcript of that proceeding ("the 3-23-10 Transcript") constitutes a necessary part of the record on appeal. *See* FED. R. APP. P. 10(a)(2), 30(a)(1); 3d Cir. L.A.R. 30.3(a) (establishing that transcripts must be included in the appendix if they are "necessary for an understanding of the issues presented for decision"). Although Claxton ordered the 3-23-10 Transcript,[1] and although it was made part of the

---

[1] *See* Tr. Purchase Order, *United States v. Mark*, No. 06-cr-80 (D.V.I. Nov. 26, 2012), ECF No. 1402. Notably, Claxton's request for the transcript was untimely. He filed the notice of this appeal in the District Court on October 9, 2012. He was then bound to order the 3-23-10 Transcript within fourteen days. *See* FED. R. APP. P. 10(b)(1). But he did not order the 3-23-10 Transcript until November 26, 2012, forty-eight days later. It appears that this, too, might warrant dismissal of this aspect of the appeal. *See* 3d Cir. L.A.R. 11.1 (2010) ("Within 14 days after filing a notice of appeal, the appellant must deposit with the court report the estimated cost of the transcript of all or the necessary part of

District Court's record,[2] he has failed to include, provide explicit citation to, or otherwise refer to it on appeal.

Claxton's failure to include, explicitly cite, or otherwise refer to the relevant portions of the District Court record warrants dismissal pursuant to the Federal Rule of Appellate Procedure 30 and related case law. *Marcinak v. W. Indies Inv. Co.*, 299 F.2d 821, 823 (3d Cir. 1962) ("Although all of the record is 'available' to the court on appeal, unless there is some special circumstance nothing will be noticed that does not appear in the appendix of the appellant or the appellee."); *Hornin v. Montgomery Ward & Co.*, 120 F.2d 500, 504 (3d Cir. 1941); *see also Abner v. Scott Mem'l Hosp.*, 634 F.3d 962, 964-65 (7th Cir. 2011) (surveying cases from both the United States Court of Appeals for the Seventh Circuit and other courts that dismissed appeals (or summarily affirmed district court judgments) as sanction for violating Federal Rule of Appellate Procedure 30); *United States v. Kush*, 579 F.2d 394, 397 (6th Cir. 1978) ("In published Opinions, this court has dismissed appeals for failure to comply with Rule 30."). Such dismissal, though generally disfavored, falls within the exercise of this Court's sound

---

the notes of testimony taken at trial. . . . Failure to comply with this rule constitutes grounds for dismissal of the appeal."); *Horner Equip. Int'l, Inc. v. Seascape Pool Ctr.*, 884 F.2d 89, 92-93 (3d Cir. 1989).

[2] *See* 3-23-10 Transcript, *United States v. Mark*, No. 06-cr-80 (D.V.I. Jan. 20, 2013), ECF No. 1408. Because the 3-23-10 Transcript was docketed in the District Court in January of 2013, three months before the defendant filed the Joint Appendix, his failure to include, cite, or refer to the 3-23-10 Transcript on appeal is puzzling.

discretion.  *See* FED. R. APP. P. 3(a)(2); *see also Horner Equip.*, 884 F.2d at 93.

To be sure, dismissal seems particularly appropriate here.  As noted in the margin, Claxton ordered a copy of that transcript before assembling an appendix for appeal.  Further, it appears that he had ample opportunity to review and analyze the substance of the 3-23-10 Transcript, which was docketed in the District Court approximately three months before he submitted his appendix to this Court.  Accordingly, he has no excuse for failing to either point us generally to that document or draw our attention to specific portions of it.

It has been oft-noted that "'Judges are not like pigs, hunting for truffles buried in' the record." *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006) (quoting *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam))). And this Court has frequently instructed parties that they bear the responsibility to comb the record and point the Court  to the facts that support their arguments.  *See id.*; *Hornin*, 120 F.2d at 504; *see also Chavez v. Sec'y Fl. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("Making [the] courts dig through volumes of documents and transcripts would shift the burden of sifting from [appellants] to the courts.  With a typically heavy caseload and always limited resources, [the courts] cannot be expected to do [an appellant's] work for him."); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make [the appellant's] case for him."). Because Claxton failed to heed those warnings, his appeal,

3

insofar as it relates to that failure, should have been dismissed.