**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2294
_____

UNITED STATES OF AMERICA

v.

STACY GALLMAN,
                              Appellant
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-20-cr-00298-001)
District Judge: Honorable Karen S. Marston
_____

Argued on November 16, 2022

Before: HARDIMAN, PORTER, and FISHER, *Circuit
Judges*.

(Filed: January 9, 2023)


Keith M. Donoghue **[Argued]**
Brett G. Sweitzer

Leigh M. Skipper
Andrew Moon
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

      *Counsel for the Appellant*


Jennifer Arbittier Williams
Robert A. Zauzmer
Ashley N. Martin **[Argued]**
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

      *Counsel for the Appellee*

_____

OPINION OF THE COURT
_____


**HARDIMAN**, *Circuit Judge*.

Stacy Gallman appeals his judgment of conviction following a jury trial. He claims the District Court erred when it: (1) closed part of his trial to the public in violation of the Sixth Amendment; and (2) admitted evidence of his prior felony conviction. Neither argument is persuasive, so we will affirm the judgment of the District Court.

I

This case arises from a traffic stop in Philadelphia, Pennsylvania. Two police officers, Joshua Kling and Thomas Nestel, stopped Gallman after they saw him run a stop sign. When Nestel approached Gallman's passenger, Nafese Kelly-Sizer, he saw a firearm magazine sticking out of Kelly-Sizer's pants pocket. Nestel handcuffed Kelly-Sizer and recovered a firearm from his waistband. After the firearm was recovered, Kling removed Gallman from the driver's seat and frisked him, uncovering nothing. Before returning to search the vehicle, Kling handed a handcuffed Gallman to Jesse Rosinski, an officer who had joined the stop with his partner, Zachary Stout. Rosinski brought Gallman to the patrol car and placed him in the back seat. Meanwhile, Kling discovered a firearm at the base of the driver's seat, so he asked Rosinski to remove Gallman from the patrol car to search him again. Upon doing so, Rosinski noticed a firearm magazine in the backseat of the patrol car that had not been there before. The officers later recovered more ammunition from Gallman's car.

Gallman, who had a prior conviction for first-degree robbery, was charged with one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Gallman unsuccessfully moved to suppress the evidence recovered from the traffic stop. During the suppression hearing, the Government informed the District Court that there was an open Philadelphia Police Internal Affairs Division (IAD) investigation about Rosinski's failure to call a supervisor to a traffic stop. Following the hearing, the Court asked the Government to subpoena the IAD investigator so the Court could question him outside the presence of the jury. The Government agreed to do so. Separately, the Government emailed the Court *ex parte*, attaching an IAD memorandum

3

regarding a racial profiling complaint against Rosinski and Stout for the Court to review *in camera*. The Government advised that the matter was closed prior to Gallman's arrest and that the allegation of racial profiling was unfounded. The Government also argued that the information was not discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) or *Giglio v. United States*, 405 U.S. 150 (1972).

Gallman was tried in June 2021 according to a COVID-19 protocol adopted by the United States District Court for the Eastern District of Pennsylvania. The trial was conducted in one courtroom and video streamed to another (courtroom 7B), where members of the public and Gallman's family were seated. The Sixth Amendment issues on appeal arise from the alleged lack of a public video stream during two proceedings on the second day of trial.

A

The first challenged proceeding occurred after the jury had been selected and sworn. Before the jury was brought in for preliminary instructions and opening statements, the Court asked Gallman whether he wanted to stipulate to the fact of his prior felony conviction for first-degree robbery. The Court explained that if Gallman stipulated that his prior conviction was for a crime punishable by more than a year in prison, "that's the only thing the jury is going to hear." App. 723. The Court cautioned Gallman to think "very carefully" and consult his attorney about whether he wanted the jury to know the details of his prior conviction. App. 723. In response, Gallman stated "I am 31 years old. And that happened when I was 16 years old. So that's 15 years ago and I am not the same person. So I am open to them questioning me about that." App. 724.

4

The Court then advised Gallman that the Government had disclosed *ex parte* potential *Brady* or *Giglio* material: a formal complaint against Rosinski and Stout for racial profiling. The Court explained that the complaint had not been sustained; the IAD found only that the officers failed to maintain their patrol log, and the investigation was closed two months prior to Gallman's arrest. The Court then ruled that, based on its *in camera* review, the Government did not have to turn over the IAD investigative file to Gallman.

Gallman asked the Court whether he could cross-examine Rosinski and Stout about the racial profiling allegations. The Government opposed that request because the complaint was unfounded. Gallman responded that it was up to the jury to weigh the officers' credibility. The Government then pointed out that Rosinski and Stout were "backup officers" for Gallman's search and arrest. Though Gallman disputed that characterization, the Court agreed with the Government, noting that it "might be a different scenario if we were dealing with the two officers that actually conducted the stop." App. 733–34. The Court also found it "important" that the IAD complaint "was not founded at all." App. 734. So the Court did not allow Gallman to cross-examine Rosinski and Stout about the racial profiling allegations.

The record does not expressly indicate whether the video stream to courtroom 7B was on during the proceeding just described. And although the transcript of the proceeding was sealed, it is unclear whether that occurred at the behest of one or both parties, or the Court.

B

The second closed proceeding occurred later that same day, after the Court excused the jury for lunch. It too involved an IAD investigation, but this one remained pending and involved Rosinski alone. The Court called a lieutenant from the IAD, Dennis Keenan, into the courtroom for questioning about the investigation. After an inadvertent interruption by a juror at the start of the questioning, the Court stated "we can lock that door, right? I think 7B can be on. The only people that cannot be in here is the jury." App. 182. Gallman's counsel responded: "I didn't know if there was anything that the Government wanted to seal." App. 182. In response, the Government moved to seal Keenan's testimony because it concerned "an open investigation." *Id.* The Court then stated "Okay. Let's turn off 7B." *Id.* Gallman's counsel did not object.

Upon questioning by both parties and the Court, Keenan testified that he investigated a complaint that Rosinski failed to call a supervisor to a traffic stop. Keenan added that the complaint was unfounded because Rosinski's partner had called a supervisor to the scene. But Keenan's superiors had not yet approved his report, so the matter remained open. After the questioning, the Government withdrew its motion to seal the transcript.

C

Gallman's trial lasted four days. Before admitting evidence regarding Gallman's prior conviction, the Court gave him another chance to stipulate. Gallman declined. The Government then introduced certified copies of Gallman's fingerprint card from his prior conviction and of the conviction itself. The Government also read into the record that Gallman

"was convicted of first degree felony robbery and was sentenced to a term of not less than five years and not more than ten years of incarceration." App. 501. Before the prior-conviction evidence was introduced, the Court instructed the jury that it could not consider the evidence for any purpose except to prove that Gallman had been convicted of a crime punishable by imprisonment for a term exceeding one year. The jury found Gallman guilty on one count of violating § 922(g)(1) and the Court sentenced him to 42 months' imprisonment. Gallman timely appealed.

## II

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291. Because Gallman did not object to the closure of the two proceedings by the District Court, plain-error review applies to his argument that those closures violated his Sixth Amendment right to a public trial. *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020). We review the District Court's decision to admit the evidence of Gallman's prior conviction for abuse of discretion. *United States v. Starnes*, 583 F.3d 196, 213–14 (3d Cir. 2009).

## III

We first consider whether the District Court committed plain error in violation of Gallman's Sixth Amendment public-trial right by closing two proceedings to the public. To succeed on plain-error review, Gallman must show: (1) an "error" that (2) is "plain" and (3) "affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (alteration omitted) (quoting Fed. R. Crim. P. 52(b)). If all three conditions are satisfied, it is "within [our] sound discretion" to correct the

7

error—but only if it (4) "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration omitted) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

A

Did the District Court err when it closed the two proceedings?[1] This is a close question on the facts of this case, which involve a jury trial conducted during a pandemic.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONT. amend. VI. In addition to the proof offered at trial, the Supreme Court has held that the right attaches to pre-trial suppression hearings, *Waller v. Georgia*, 467 U.S. 39, 47 (1984), and jury selection, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam). The public-trial right likely does not extend to sidebars or chambers conferences, however. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 598 n.23 (1980) (Brennan, J., concurring in the judgment); *United States v. Smith*, 787 F.2d 111, 114 (3d Cir.

---

[1] The parties dispute whether the first proceeding was in fact closed to the public. Gallman claims the video stream to courtroom 7B was inactive during the first alleged closure because the transcript of the proceedings describes them as under seal. The Government counters that there is no evidence in the record that the first closure occurred because the trial transcript says nothing about the video feed at that time. We assume both proceedings were closed for purposes of this appeal.

1986). Nor is the public-trial right absolute. The Supreme Court has reiterated:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Presley*, 558 U.S. at 214 (alteration omitted) (*quoting Waller*, 467 U.S. at 48). The District Court made no findings before closing either proceeding at issue here.

Gallman argues that the public-trial right attaches to the first proceeding by analogizing it to suppression hearings described in *Waller*. Some similarities do exist—here, counsel at the first proceeding argued whether certain evidence should be presented to the jury, and the court excluded that evidence from trial, in part based on the resolution of a factual dispute (whether Rosinksi and Stout were backup officers). *See Waller*, 467 U.S. at 47. Further, the *Waller* Court noted that the need for public suppression hearings is particularly important because they "frequently attack[] the conduct of police and prosecutor," and the public "has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny." *Id.* The same strong public interest is present in this case, where the District Court reviewed police misconduct investigations to determine whether they constituted *Brady* or *Giglio* material.

On the other hand, the determination of whether certain information is subject to disclosure under *Brady* or *Giglio* is

9

routinely handled outside of public view, without any hearing at all. *See United States v. Wecht*, 484 F.3d 194, 214 (3d Cir. 2007), *as amended* (July 2, 2007) (approving of *in camera* review of potential *Brady* or *Giglio* material). Likewise, the scope of cross-examination is typically adjudicated during sidebars to which the public are not privy. *See Smith,* 787 F.2d at 114 (noting that "the public and press may be justifiably excluded from sidebar and chambers conferences even when substantive rulings are made"); *United States v. Norris*, 780 F.2d 1207, 1209–11 (5th Cir. 1986) (holding that the right to a public trial does not extend to non-public chambers and bench conferences on evidentiary questions, technical legal issues, and routine administrative matters).

The second closed proceeding in this case is even less like suppression hearings and the "actual proof" presented at trial. *Waller*, 467 U.S. at 44. Lieutenant Keenan was not a witness for either party; the hearing was not conducted pursuant to a motion by either party; the parties did not make argument at the hearing; and the Court did not make an evidentiary or other substantive ruling based on Keenan's testimony. It thus does not "resemble[] a bench trial" nor was it "as important as the trial itself." *Id.* at 46–47.

Whether the Sixth Amendment public-trial right attaches to proceedings like these is a close question. If it does, the District Court's failure to explain why they were closed was erroneous. *See id.* at 47–48. But for an error to be *plain*, the correct resolution must be "'clear' or 'obvious'" under current law. *United States v. Scott*, 14 F.4th 190, 198 (3d Cir. 2021) (quoting *Olano*, 507 U.S. at 734). It is not here.

Neither the Supreme Court nor our Court has decided whether the Sixth Amendment public-trial right attaches to

10

proceedings like those at issue in this case—brief, investigatory hearings related to potential *Brady* or *Giglio* material. And the cases Gallman cites do not demonstrate a "consensus among the Circuits" necessary to make plain that the Sixth Amendment covers these proceedings. *Scott*, 14 F.4th at 199.

Gallman first points to *U. S. ex rel. Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969) (en banc) and *United States v. Smith*, 787 F.2d 111 (3d Cir. 1986) to establish that his Sixth Amendment right attached to the closed proceedings. *Bennett* addressed a suppression hearing regarding a defendant's confession, 419 F.2d at 603, and for reasons already explained, the proceedings here differ from suppression hearings in material respects (particularly because *Brady* and *Giglio* determinations are routinely made out of public view). While we did say in *Bennett* that "a hearing which … is held as part of the trial and after the jury has been sequestered, falls within the [public-trial] guarantee," 419 F.2d at 606, we did not hold that *any* proceeding occurring after the jury is empaneled is "part of the trial." Such an inference goes too far, particularly since *Bennett* was decided before *Waller* and *Presley*.

*Smith* is even further afield—it considered the First Amendment right of the public and the press to access transcripts of sidebars and chambers conferences. 787 F.2d at 113. While the Supreme Court has said "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public," *Waller*, 467 U.S. at 46, it has also said that "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive is an open question," *Presley*, 558 U.S. at 213. And we recognized in *Smith* that there may be no "constitutional . . . right of contemporaneous presence" with

11

respect to sidebar and chambers conferences, such that "the public and press may be justifiably excluded" from those proceedings. 787 F.2d at 114. Even if the Sixth Amendment public-trial right also attaches to transcripts of sidebars and chambers conferences (like the First Amendment right does), *Smith* did not establish that the right attaches to public observation of the somewhat analogous proceedings here—at least not with sufficient clarity to make any error plain.

Gallman also cites three nonbinding cases which fail to establish that any error here was plain: *United States v. Waters*, 627 F.3d 345 (9th Cir. 2010); *Rovinsky v. McKaskle*, 722 F.2d 197 (5th Cir. 1984); and *State v. Morales*, 932 N.W.2d 106 (N.D. 2019). *Rovinsky*, 722 F.2d at 200, and *Morales*, 932 N.W.2d at 114–15*,* held that the Sixth Amendment public-trial right attached to motion in limine hearings. But the hearings here were not on motions in limine; they were not on motions at all. And two years after *Rovinsky*, after *Waller* was decided, the Fifth Circuit reaffirmed that the public-trial right does not attach to closed proceedings that involve "technical legal questions" and "evidentiary rulings." *Norris*, 780 F.2d. at 1210. Other circuits too have questioned the implications of *Rovinsky*'s holding. *See, e.g.*, *United States v. Vazquez-Botet*, 532 F.3d 37, 52 n.10 (1st Cir. 2008). Further, the North Dakota Supreme Court in *Morales* relied on its own caselaw and *Waller* to reverse and remand following the closure of a motion in limine hearing. 932 N.W.2d at 114–15, 120.

These authorities fall well short of the requisite "consensus" among our sister circuits, particularly because the hearings here are only somewhat like motion in limine hearings. *See Scott*, 14 F.4th at 199; *see also Smith v. Titus*, 958 F.3d 687, 692–93 (8th Cir. 2020) (stating that it is an "open question" whether the public-trial right encompasses motion in

12

limine proceedings), *cert. denied*, 141 S. Ct. 982 (2021). Nor does *Waters* advance Gallman's argument. There, the Ninth Circuit held that the public-trial right attaches to a hearing on a motion to dismiss an indictment for governmental misconduct, 627 F.3d at 360—a substantively different proceeding from those here, and one that was likely dispositive. *See Waller*, 467 U.S. at 46–47.

In sum, any error in closing the video livestream to the public did not constitute reversible plain error because it was not "clear under current law" that the Sixth Amendment public-trial right attached to the closed proceedings. *Olano*, 507 U.S. at 734.

B

Even assuming that any error was plain and that it affected substantial rights, we would decline to exercise our discretion to grant Gallman a new trial. *Olano* requires us to "weigh[] the costs to the fairness, integrity, and public reputation of judicial proceedings that would result from allowing the error to stand with those that would alternatively result from providing a remedy." *Williams*, 974 F.3d. at 344. We hold that Gallman cannot satisfy that high standard. Several factors lead us to this conclusion.

First, the closures here were brief and resulted from the challenges of conducting a trial during a pandemic rather than any substantive decision by the District Court. The public had access to almost all of Gallman's trial, including jury selection and the pre-trial suppression hearing. *See id.* at 346.

Second, some of the topics discussed at the closed proceedings were discussed in open court—the misconduct

investigations were referenced generally at the suppression hearing, and Rosinski testified at trial regarding the open IAD investigation.

Third, the District Court was prompted to close the second proceeding by counsel (first, for Gallman; then the Government) after originally suggesting merely locking the courtroom door to prevent jurors from re-entering. *Cf. Williams*, 974 F.3d at 346 (noting that the district court issued a closure order *sua sponte*, thereby stamping the closure with the "imprimatur of the federal judiciary").

Most significantly, Gallman's trial "possessed the publicity, neutrality, and professionalism that are essential components of upholding an accused's right to a fair and public trial." *Id.* at 347. There is no "suggestion of misbehavior by the prosecutor, judge, or any other party." *Id.* (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017)). And the costs of retrial would greatly outweigh any benefit given the brevity and collateral nature of the closed proceedings. *See Williams*, 974 F.3d at 347 (retrial demands "'a high degree of caution'" even absent "heavy burdens") (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018)).

So even assuming plain error here, it would not be appropriate for us to exercise our discretion at prong four of *Olano* to remand for a new trial.

IV

We next consider Gallman's argument that the District Court abused its discretion under *Old Chief v. United States*, 519 U.S. 172 (1997), and Rule 403 of the Federal Rules of Evidence by admitting evidence that he had pleaded guilty to

robbery and had been sentenced to five to ten years' imprisonment.

In *Old Chief*, the Supreme Court held that, in a § 922(g)(1) prosecution, it is an abuse of discretion under Federal Rule of Evidence 403 for a trial court to reject a defendant's offer to stipulate or admit to a prior conviction and instead admit the full record of conviction. 519 U.S. at 174. The Court explained that, where such evidence is relevant only to prove the fact of the prior felony conviction, the prejudicial effect of the conviction record substantially outweighs any probative value. *Id.* at 191.

Gallman claims the District Court erred when it did not exclude all the evidence regarding his prior conviction beyond the fact of his prior felony conviction. Emphasizing that he admitted (to the Court, not the jury) that he knew he was a felon and had no objection to questioning about that prior conviction, he claims entitlement to the protections of *Old Chief*. We disagree.

*Old Chief* is a shield, not a sword. Before the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), defendants charged with violating § 922(g)(1) routinely sought the protections of *Old Chief* by stipulating to the fact that they had been previously convicted of a crime punishable by more than a year in prison. *Rehaif* brought a sea change to these cases, however, by requiring the prosecution to prove not only the fact of the prior conviction, but also the defendant's knowledge of it. 139 S. Ct. at 2200. So in this case, the Government had to prove, beyond a reasonable doubt, that Gallman knew he was a felon prohibited from carrying a firearm.

15

Instead of stipulating to both status and knowledge, Gallman stated merely that he was "open to [the Government] . . . questioning [him] about [his prior conviction]." App. 724. In fact, Gallman *declined* to stipulate to the fact of his prior conviction on multiple occasions. His words are a far cry from the "conclusive evidence" that a stipulation or admission affords the prosecution in a § 922(g)(1) case, particularly after *Rehaif*. *Old Chief*, 519 U.S. at 186. In sum, Gallman did not concede his status as a "prohibited person" under § 922(g)(1), as was his right. But he had no right to impair the Government's ability to prove its case.

Nor did the District Court abuse its discretion in admitting the prior-conviction evidence. Rule 403 authorizes exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

Here, the District Court admitted a certified copy of Gallman's fingerprint card from his prior conviction and portions of a certified copy of his criminal conviction. Those documents showed that Gallman pleaded guilty to robbery and was sentenced to five to ten years' imprisonment. The Court explained on the record why the prior-conviction evidence was probative—it demonstrated Gallman's felon status and made it more likely that Gallman was aware of it.

The Court ensured that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. It excluded certain evidence related to the prior conviction, including a police report and statements identifying the statutory maximums on all the charges Gallman faced. And, when the prior-conviction evidence was admitted, the Court instructed the jury to consider it only for the purpose

of proving that Gallman had been convicted of a crime punishable by imprisonment for more than a year. The Court reiterated this limited purpose in its final instructions to the jury.

For these reasons, the Court's decisions under Rule 403 were well within its broad discretion.

\* \* \*

The closure of two proceedings during Gallman's trial was not plainly erroneous and did not affect the fairness, integrity, or public reputation of judicial proceedings. Nor did the District Court abuse its discretion in admitting evidence of Gallman's prior conviction. We will affirm.