**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 24-2097 & 24-2148
_____

UNITED STATES OF AMERICA

v.

PAUL GIRARD, a/k/a Bogus,
Appellant in Appeal No. 24-2097
_____

UNITED STATES OF AMERICA

v.

KAREEM HARRY, a/k/a Crumbull,
Appellant in Appeal No. 24-2148

On Appeal from the District Court of the Virgin Islands
(D.C. Nos. 3:18-cr-00030-001, -007)
District Judge: Hon. Timothy J. Savage

Argued December 9, 2025

Before: HARDIMAN, BIBAS, and PORTER, *Circuit Judges*

(Filed: May 26, 2026)

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

This appeal involves the Sixth Amendment right to a public trial. Appellants Paul Girard and Kareem Harry were deprived of that right when their trial began with no public access to the courtroom, and again when federal marshals stationed outside the courtroom prevented their mothers from entering for several trial days. But neither Defendant objected to any of this, and they were afforded a fair trial. So we will affirm their judgments of conviction.

I

Girard was the head of a violent drug-trafficking enterprise in the U.S. Virgin Islands. The jury convicted him of 22 counts of drug, firearm, racketeering, and other charges. Harry was an armorer for the enterprise, and the jury convicted him of seven counts of racketeering and firearms charges. Their trial was conducted in March 2022 and began the day after the Chief Judge of the District Court of the Virgin Islands issued an order "reinstat[ing] certain in-person proceedings" that had been suspended in response to the COVID-19 pandemic. *See* February 28, 2022 Order, Miscellaneous No. 2020-0001 at 1, ECF No. 36 on Dist. Ct. Dkt. 20-mc-00001.

Because the Virgin Islands had seen a "downward

2

trend" in infections, the Chief Judge ordered "incremental resumption of civil and criminal jury trials." *Id.* at 4–5. But the order also "recognize[d]" that COVID-19's "threat to public health and safety" and "unpredictability" required "precautionary and preventive measures" and "flexibility." *Id.* at 2–3. Consistent with that order, the District Court provided an overflow room with an audiovisual feed of the proceedings for those who could not watch from the courtroom. The jury chose to sit in the jury box for the trial.

After the jury was selected and before opening arguments, Girard's lawyer asked the District Court "what accommodations ha[d] been made for the public to view th[e] trial." Harry App. 293. Counsel also requested "that at least the defendant's family be able to sit in th[e] courtroom" to "comply with the Constitution" and "give the defendant . . . moral support." *Id.* The Court initially refused, but acceded to a request by Harry's counsel that the jury be told about the overflow room. Later that same day, the Court informed the parties that it would allow some spectators into the courtroom the next day.

The next morning, Harry's lawyer observed that Harry's mother was not in the courtroom. Counsel asked whether the District Court was "restricting who enters this courtroom." Harry App. 524. The Court responded, "[a]bsolutely not," *id.*, and Harry's lawyer inquired no further. Several days later, Harry's lawyer noted that an article in a local newspaper had reported that the overflow room did not open to the public until around 10:00 a.m. during one of the previous trial days. The Court responded that the closure was "an inadvertent error" that would not happen again, and it noted that the courtroom had seats available at the time the overflow room was closed. Harry App. 1459. A day later,

3

Harry's lawyer told the Court that Harry's mother had been prevented from entering the courtroom that morning by a federal marshal who apparently believed that family members were not permitted. The Court told counsel it would "deal with that." Harry App. 1481. None of the defendants mentioned the exclusion of any friends and family from the courtroom during the final four days of trial.

After they were found guilty, Harry and Girard moved for a new trial. Relevant here, they argued that their Sixth Amendment rights to a public trial had been violated. The District Court held an evidentiary hearing on the matter and heard testimony from several witnesses. The only witness the Court found credible was Girard's mother, who testified that for all but the last few days of the trial, federal marshals told her and Harry's mother that they had to watch from the overflow room and never explained why. As for the audiovisual feed, she testified that it showed the judge, whatever lawyer was speaking at a given time, the witnesses, some jurors, and sometimes the Defendants. She added that the feed stopped working once, but she said the interruption took only three or four minutes to rectify, and it did not cause her to miss any of the proceedings.

The District Court denied the motions. In its brief discussion of Defendants' public-trial rights, the Court explained that social distancing "necessarily limited available seating for the public in the gallery." *United States v. Girard*, 2024 WL 2319635, at *5 (D.V.I. May 22, 2024). It found that "[s]eats were available on a first-come basis," while those who could not find seats could watch virtually. *Id.* And it found that any glitches or interruptions in the audiovisual feed were "brief" and corrected as soon as someone notified the Court. *Id.* It therefore held that "the public was not excluded from the

4

trial." *Id.*

## II[1]

### A

We review the District Court's factual findings for clear error. *See United States v. Claxton*, 766 F.3d 280, 293 (3d Cir. 2014). We determine de novo whether those facts constitute a violation of the public-trial right. *See id.* But since Harry and Girard failed to raise adequate contemporaneous objections to the alleged errors, we will vacate their convictions only if the "error[s]" (if any) were "plain," "affect[ed] substantial rights," and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Harry concedes that he did not object contemporaneously to the errors he claims on appeal. And the closest Girard came to objecting was between jury selection and opening arguments, when his lawyer asked the District Court to allow Girard's family into the courtroom "to comply with the Constitution" and so they could give "moral support." Harry App. 293. That is not enough to preserve a public-trial argument challenging the District Court's requirement that all spectators watch from the overflow room. Parties must present arguments "squarely," so the district court has a chance to resolve them in the first instance. *United States v. Johnson*, 19 F.4th 248, 255 (3d Cir. 2021) (citation omitted); *see also*

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231 and 48 U.S.C. § 1612(a). We have jurisdiction under 28 U.S.C. § 1291.

5

*United States v. Abreu*, 32 F.4th 271, 274 (3d Cir. 2022) (parties must present arguments to a district court with "sufficient[] particulari[ty]"). The mere phrase "to comply with the Constitution" is too vague to adequately apprise the District Court of how its action violated the Public Trial Clause. *See United States v. Grant*, 9 F.4th 186, 200 (3d Cir. 2021) ("[V]ague allusion to the key . . . issue . . . does not suffice to preserve it for appeal." (citation modified)).

Nor did Girard's lawyer mention the marshals' later exclusion of Girard and Harry's mothers from the courtroom. So we review only for plain error.

B

We begin by determining whether Harry and Girard were afforded their Sixth Amendment right "to a . . . public trial." U.S. Const. amend. VI. A public trial is presumptively "open to all who care to observe." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980) (plurality opinion). Open trials are a feature of "Anglo-American justice" that "can be traced back beyond reliable historical records," *id.*, and under the Sixth Amendment defendants may "insist" that the tradition continue in their own trial, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam). The Supreme Court has stated that the right is not absolute and "may give way in certain cases." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). The presumption of openness is strong, but the Court has long held that an "overriding interest" can justify closing proceedings to spectators. *Id.* (citation omitted).

Because circumstances that warrant closing the courtroom will be "rare," a trial judge must take "special care" to balance the relevant interests before shutting the doors. *Id.*;

6

*see also Presley*, 558 U.S. at 215 ("Trial courts are obligated to take every reasonable measure to accommodate public attendance."). The judge must determine that the closure is "no broader than necessary to protect [the overriding] interest," "consider reasonable alternatives" (whether suggested by the parties or not), and "make findings adequate to support the closure." *Waller*, 467 U.S. at 48; *Presley*, 558 U.S. at 214–15.

More often, trial judges will confront circumstances that do not warrant closing the courtroom but may require excluding specific spectators. Our sister courts that have addressed that situation recognize that those narrower exclusions place a smaller burden on the interests protected by the public-trial right. So they hold that such exclusions need only be supported by a *substantial* reason, rather than an *overriding* one.[2]

That approach is consistent with our pre-*Waller* cases holding that "the Sixth Amendment . . . limits the trial judge to the exclusion of those persons or classes of persons only whose particular exclusion is justified by lack of space or for reasons particularly applicable to them." *U.S. ex rel. Laws v. Yeager*,

---

[2] *See United States v. DeLuca*, 137 F.3d 24, 33–34 (1st Cir. 1998); *Woods v. Kuhlmann*, 977 F.2d 74, 76–77 (2d Cir. 1992); *United States v. Smith*, 117 F.4th 584, 596–98 (4th Cir. 2024), *cert. denied sub nom. Alcorn v. United States*, 145 S. Ct. 1340 (2025), *and cert. denied*, 146 S. Ct. 92 (2025); *United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995); *United States v. Simmons*, 797 F.3d 409, 413–14 (6th Cir. 2015); *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989); *United States v. Galloway*, 937 F.2d 542, 545–46 (10th Cir. 1991); *Judd v. Haley*, 250 F.3d 1308, 1315–16 (11th Cir. 2001).

448 F.2d 74, 80–81 (3d Cir. 1971) (quoting *United States v. Kobli*, 172 F.2d 919, 923 (3d Cir. 1949)). We observed in those cases that, in addition to space constraints, indecorous conduct and witness intimidation are reasons that could justify excluding individual spectators. *See Yeager*, 448 F.2d at 80–81; *Kobli*, 172 F.2d at 922. As with a total closure, excluding certain spectators is permissible only after a trial judge has considered reasonable alternatives, determined that the exclusion is necessary to protect the identified interest, and made a factual record sufficient to support the exclusion. *See Drummond v. Houk*, 797 F.3d 400, 402 (6th Cir. 2015) ("[T]he Supreme Court [in *Waller*] began its analysis by stating a general rule that applies to any type of courtroom closure, to wit: a trial court must balance the interests for and against.").

With these principles as our guide, we conclude that two errors occurred.

1

First, the District Court erred when it required all spectators to observe the trial from the overflow room on the first day without explaining why alternatives were inadequate. When the Court relegated all interested spectators to the overflow room, the courtroom ceased to be open and the Court was obligated to justify that decision.[3] The Government briefly

---

[3] Another Court of Appeals has held that when a district court requires all interested spectators to view by audiovisual feed, the court effects only a "partial closure." *United States v. Ansari*, 48 F.4th 393, 401 & n.7 (5th Cir. 2022). But the term "partial closure," as our sister courts use it, refers to an exclusion of some but not all spectators. *See, e.g.*, *Osborne*, 68

argues that the closure was a "trivial" one—meaning a closure so insignificant that it did not implicate any of the public-trial right's purposes and so did not require any justification by the trial judge. *See Zornes v. Bolin*, 37 F.4th 1411, 1417 (8th Cir. 2022); *Peterson v. Williams*, 85 F.3d 39, 42–43 (2d Cir. 1996). But even assuming that the Public Trial Clause permits so-called trivial closures without justification—a debatable proposition given the text of the Constitution—the closure in this case would not qualify. Solemnity is a central purpose of the public-trial right. *See Waller*, 467 U.S. at 46 ("[T]he presence of interested spectators may keep [a defendant's] triers keenly alive to a sense of their responsibility and to the importance of their functions.") (internal quotation marks omitted). And the physical presence of spectators serves that purpose better, to a nontrivial degree, than viewing remotely. *Cf. Coy v. Iowa*, 487 U.S. 1012, 1017–20 (1988) (explaining the virtues of face-to-face confrontation). Nor was the prohibition of spectators limited to a trivial duration or scope, as it spanned the opening arguments and some evidence presentation. *Cf. United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003) (closure during "routine jury administrative matters that have no bearing on [defendant]'s ultimate guilt or innocence" was trivial).

In sum, before the District Court could close the courtroom, it had to identify an overriding interest and consider whether that interest could be served by less restrictive alternatives. Several of our sister courts have held that protecting trial participants from COVID-19 is an overriding interest. *See United States v. Hunt,* 82 F.4th 129, 140 (2d Cir.

F.3d at 98. We do not understand how an exclusion of *all* spectators can be a *partial* closure.

9

2023); *United States v. Veneno*, 94 F.4th 1196, 1204–05 (10th Cir. 2024); *United States v. Allen*, 34 F.4th 789, 797 (9th Cir. 2022); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest."). And remote spectating might sometimes be necessary to serve that interest. *Veneno*, 94 F.4th at 1204–06 (district judge required virtual viewing because the jurors needed all the space in the courtroom to spread out); *Hunt*, 82 F.4th at 141–42 (district judge required virtual viewing because the trial participants alone placed the courtroom at higher occupancy than that recommended by an epidemiologist-consultant). But not so in this case, where there was at least one possible less restrictive alternative: the Court permitted spectators into the courtroom with social distancing after the first day of evidence. Without anything in the record showing why sparse attendance was inadequate for day one but fine for the remaining days, we cannot conclude that the District Court chose the least restrictive closure reasonably available.

2

Second, after the District Court's decision to open the courtroom, it was error for the federal marshals to continue excluding Girard and Harry's mothers when sparse seating was available. We conclude that the two mothers were excluded even though the District Court found that seating was available to all "on a first-come basis," *Girard*, 2024 WL 2319635, at *5, because that statement is irreconcilable with the Court's more specific findings and observations. Girard's mother testified—and the Court found credible—that she and Harry's mother were prevented from entering the courtroom for several days. And the Court observed that on at least one of those days, some of the seats in the courtroom were available.

10

As with the remote-viewing requirement on the first day, relegating Defendants' mothers to the overflow room on later days when seats were available in the courtroom was not trivial. Their physical presence would have kept their sons' "triers keenly alive." *Waller*, 467 U.S. at 46 (citation omitted). Indeed, they were especially likely to watch closely and consistently given their "special concern with the trial." *See Yeager*, 48 F.2d at 80 (quoting *Kobli*, 172 F.2d at 922).

Excluding the mothers was problematic because there are no reasons in the record that could support doing so. Indeed, the District Court apparently did not even know they were being excluded, so it never tried to justify the marshals' actions. The fact that the District Court was unaware of the exclusions as they were happening does not alter our conclusion that Defendants were not afforded the full protection of the public-trial right. *Accord Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004); *United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005); *United States v. Negron-Sostre*, 790 F.3d 295, 304 (1st Cir. 2015).

C

The errors just described do not warrant reversal, however. Even assuming they were plain and affected substantial rights, we will not exercise our discretion to remedy them because they did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Williams*, 974 F.3d at 340 (quoting *Olano*, 507 U.S. at 732). This prong of plain-error review requires us to weigh the costs of allowing the error to stand against the costs of correcting it and to determine "which result would most promote the ends of justice." *Id.* at 344 (citation modified). Our "chief[]" concern in evaluating the costs to fairness, integrity, and

11

reputation of letting the error stand is "the error's effect on the values or interests protected" by the public-trial right. *Id*. On the other side of the ledger are the costs of retrial.

The costs of allowing the error to stand here are minimal because the trial "possessed the publicity, neutrality, and professionalism that are essential components of upholding an accused's right to a fair and public trial." *Id.* at 347. With respect to publicity, the trial was always viewable by at least some members of the public, either through the audiovisual feed or in person, and the trial participants knew that. *See id.* at 346–48 (declining to remedy public-trial violation consisting of courtroom closure with no virtual-viewing option); *United States v. Gallman*, 57 F.4th 122, 124 (3d Cir. 2023) (same). So even though physical presence in the courtroom was preferable to viewing from the overflow room, nobody involved in the trial reasonably could have thought that any of their actions would escape "contemporaneous review in the forum of public opinion." *United States v. Lnu*, 575 F.3d 298, 305 (3d Cir. 2009).

As for neutrality, nothing about the errors here should "undermin[e] public confidence in [the District Court's] impartiality." *Williams*, 974 F.3d at 346. The first-day closure that the District Court ordered was not designed for secrecy. It was a good-faith effort to protect the participants from COVID-19 during the pandemic—a laudable measure that was erroneous only because the Court neglected to consider an alternative. Also in the trial judge's defense, he was unaware that Defendants' mothers were being excluded once the courtroom was open to spectators, and he remedied the problem as soon as defense counsel made the Court aware of it. So those later exclusion decisions do not bear the "imprimatur of the federal judiciary." *Id.* at 346; *cf. Weaver v.*

12

*Massachusetts*, 582 U.S. 286, 304 (2017) (holding public-trial violation did not render trial fundamentally unfair in part because "the closure decision apparently was made by court officers rather than the judge").

Finally, professionalism was not undermined because "[t]here is no 'suggestion of misbehavior by the prosecutor, judge, or any other party.'" *Gallman*, 57 F.4th at 129 (quoting *Williams*, 974 F.3d at 347). Indeed, neither Defendant has even attempted to identify any misfeasance.

By contrast, the costs of retrying Harry and Girard would be significant. The prospect of retrial always "demands 'a high degree of caution'" on plain-error review. *Williams*, 974 F.3d at 347 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 143 (2018)). Especially so here: this racketeering and conspiracy trial spanned three weeks, concluded more than four years ago, and involved nearly 50 witnesses. *Cf. Gallman*, 57 F.4th at 124, 129 (declining to grant retrial on single firearm charge with evidence from single traffic stop). Granting Harry and Girard a retrial here would provide them a windfall inimical to the interests of justice. So their appeal does not satisfy the high bar set by plain-error review.

III

Harry also contends that he was deprived of his Sixth Amendment right to compulsory process and his Fifth Amendment right to due process. He again concedes that our review is for plain error. On these points, we perceive no error, plain or otherwise.

Harry first contends that the District Court violated his due process rights by "subject[ing]" two of his potential

witnesses, Shaquille Correa and James Cruz, to off-the-record, ex parte "meetings" that "resulted in [their] not testifying." Harry Br. 29; *see Webb v. Texas*, 409 U.S. 95, 97 (1972) (per curiam). There is no evidence of such meetings in the record. To the contrary, Harry's witnesses—who were also codefendants awaiting sentencing—notified the District Court through counsel of their intention to invoke their Fifth Amendment privilege the day after Harry requested writs of habeas corpus *ad testificandum*. The only conclusion permitted by the record is that Harry's witnesses invoked their privilege on advice from counsel, uninfluenced by the District Court.

Next, Harry argues that the District Court's failure to require that Cruz and Correa invoke their privilege question-by-question at a hearing, rather than in blanket fashion in writing, violated his right to compulsory process. This argument goes nowhere because Harry has never disputed Cruz and Correa's entitlement to the privilege. *Diggs v. Owens*, 833 F.2d 439, 444 (3d Cir. 1987) ("In general[,] a defendant's Sixth Amendment right of compulsory process gives way when a witness he has subpoenaed invokes his Fifth Amendment privilege."). We prefer question-by-question invocations of the Fifth Amendment privilege so the trial judge can accurately determine whether the witness is entitled to it. *See United States v. Morton*, 993 F.3d 198, 203–04 (3d Cir. 2021). But without any dispute about the scope of the witnesses' privilege, there was nothing for the District Court to evaluate and there is nothing for us to review.

Third, Harry argues that the District Court erroneously prohibited seven other witnesses from testifying, in violation of his right to compulsory process. One of those witnesses did not testify because, like Correa and Cruz, he invoked his Fifth Amendment privilege, and Harry again does not contend that

14

the witness was not entitled to do so. As for the other six witnesses, the District Court excluded them after determining that their testimony was irrelevant. The right to compulsory process extends only to testimony that is "material and favorable" to the defendant, *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992), so Harry needed to explain why the District Judge's relevancy determination was wrong. He has not done so.

\* \* \*

For the reasons stated, we will affirm the judgments of the District Court.

Joseph A. DiRuzzo, III       [Argued]
MARGULIS GELFAND DIRUZZO & LAMBSON

William A. Morrison
THE MORRISON FIRM

*Counsel for Appellant in Appeal No. 24-2097*

Kye Walker                       [Argued]
THE WALKER LEGAL GROUP

*Counsel for Appellant in Appeal No. 24-2148*

Scott A.C. Meisler
Tory D. Roberts                 [Argued]
UNITED STATES DEPARTMENT OF JUSTICE

*Counsel for Appellee United States of America*