**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2457

_____

UNITED STATES OF AMERICA

v.

ABDULRAHMAN ABDELAZIZ JAMEA,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:19-cr-00167-001)
District Judge:  Honorable Arthur J. Schwab

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 23, 2026

_____

Before:  RESTREPO, PHIPPS, and MASCOTT, *Circuit Judges*

(Filed: May 29, 2026)

_____

OPINION[*]

_____

PHIPPS, *Circuit Judge*.

In June 2019, an Ohio man was indicted in federal court in Pennsylvania for his involvement in a string of armed pharmacy robberies.  He was represented by court-appointed counsel, but after he requested a new attorney, the District Court assigned him a

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

different lawyer. Through that attorney, he sought to suppress evidence obtained from his smart phone because the affidavit in support of the search warrant contained a misrepresentation. The District Court denied that motion without holding a *Franks* hearing. Through that same attorney, the man also moved to dismiss the indictment based on the denial of his Sixth Amendment right to a speedy trial because his trial was scheduled to begin 57 months after his indictment. The District Court denied that motion as well. As the trial date approached, the man unsuccessfully requested a new lawyer, and later he unsuccessfully sought to represent himself. After a trial, the jury found him guilty.

This appeal of that judgment disputes the denials of the pretrial motions – to suppress and to dismiss – and it also contests the rejection of the requests for new counsel and for self-representation. For the reasons below, we will affirm the judgment of the District Court.

## BACKGROUND

Starting in September 2018, several pharmacies in Western Pennsylvania near interstate highways were robbed for controlled substances and cash. There were other commonalities among the robberies: they occurred in the morning, usually by multiple persons, one of whom was armed, and the target was always the drug safes, where the Schedule II narcotics were held.

Beyond those similar profiles, the United States Drug Enforcement Administration had no leads after the first few robberies.[1] That changed with the November 22, 2018, robbery of the CVS on Centre Avenue in Pittsburgh. Surveillance footage revealed a man wearing distinctive white shoes with pink laces acting as a lookout and a maroon

---

[1] Those include the September 6, 2018, robbery of a CVS Pharmacy on Browns Hill Road in Pittsburgh; the September 27, 2018, robbery of a CVS Pharmacy on Erie Street in Edinboro; and the November 17, 2018, robbery of a Rite Aid pharmacy on Third Street in Beaver.

2016 Hyundai Sonata with a temporary Ohio license plate as the getaway car. In investigating the robbery, the Pittsburgh police contacted the Ohio Bureau of Motor Vehicles to ascertain the ownership of the vehicle, but due to a glitch, the Ohio BMV could not provide that information until after the vehicle received permanent tags. *Cf.* Ohio Rev. Code § 4503.182(A) (2017) (indicating a temporary placard can be used for 45 days).

In early 2019, after an additional pharmacy robbery,[2] the DEA contacted the Ohio BMV for ownership information concerning the maroon Hyundai Sonata seen at the November 22 robbery. This time, the Ohio BMV reported that the registered owner of the vehicle was Abdulrahman Jamea of Reynoldsburg, Ohio, a suburb of Columbus.

As the pharmacy robberies in Western Pennsylvania continued, the clues mounted. Surveillance footage captured Jamea's Sonata as the getaway car of another robbery of the Centre Avenue CVS Pharmacy on February 14, 2019. His Sonata was also caught on surveillance footage of a May 10, 2019, robbery of a Rite Aid pharmacy on Chartiers Street in Bridgeville. The same video showed Jamea getting out of the car, entering the Rite Aid, and using a black smart phone while inside.

Days after the robbery of the Bridgeville Rite Aid, on May 15, 2019, there was a shooting at an apartment complex in Columbus, Ohio. *See State v. Jamea*, 2022 WL 1555938, at *2 (Ohio Ct. App. May 17, 2022). A twelve-year old witness indicated that after a maroon Sonata pulled up next to another car with four men inside, an occupant of the Sonata started shooting at those men, hitting one in the head. *See id.* Law enforcement found Jamea later that day at a gas station with a gunshot wound, *see id.* at *3, and after arresting him, they recovered a semi-automatic pistol and a black Apple iPhone 7 from his Sonata.

---

[2] In December 2018, the CVS Pharmacy on Pine Avenue in Erie was robbed in a similar manner.

Within a week of that development, on May 22, 2019, the DEA applied in the Western District of Pennsylvania for a warrant to search the iPhone 7. The 41-paragraph affidavit in support of that warrant sought to establish probable cause needed to search the phone. *See Dalia v. United States*, 441 U.S. 238, 255 (1979) (explaining that a Fourth Amendment warrant has three attributes: approval by a neutral magistrate, a finding of probable cause, and a particularized description of the items to be seized and places to be searched). The affidavit mentioned that surveillance footage placed Jamea's Sonata at three of the pharmacy robberies and had recorded him acting as a lookout and manipulating a black phone at the Bridgeville Rite Aid robbery.

The affidavit also included details of other pharmacy robberies that had occurred in West Virginia and Ohio, which the DEA associated with Jamea. In particular, Paragraph 26 of the affidavit described a pharmacy robbery in Vienna, West Virginia, and it averred that Jamea texted the address of that pharmacy using the iPhone 7 recovered by Ohio police. The identification of Jamea's iPhone 7 as the source of the text was incorrect; it was sent from another phone number, albeit one that the DEA associated with Jamea.

A magistrate judge, who did not know of the inaccuracy in Paragraph 26 at the time, granted that application and issued a warrant for the search of Jamea's iPhone 7. That search revealed photos of his maroon Hyundai Sonata, a video of him wearing white shoes with pink laces like those worn by the lookout at the November 2018 Centre Avenue CVS robbery, text messages coordinating the distribution of narcotics, a note that appeared to be a drug inventory, and a search to a pill-identifier website.

The law caught up with Jamea shortly afterward. With respect to the shooting in Columbus on May 15, a grand jury in Franklin County, Ohio, indicted him on May 28, 2019, on four charges of felonious assault, *see* Ohio Rev. Code § 2903.11. *See Jamea v.*

4

*Warden*, 2024 WL 4542814, at *2–3 (S.D. Ohio Oct. 22, 2024). And for the pharmacy robberies, a federal grand jury in the Western District of Pennsylvania indicted Jamea and two other men on June 11, 2019.[3] *See* 18 U.S.C. § 3231 (granting the district courts exclusive original jurisdiction over all federal prosecutions). The day after the federal indictment, a Franklin County grand jury returned a second four-count felonious assault indictment, *see* Ohio Rev. Code § 2903.11, based on accusations that Jamea shot at four women, emptying a clip, because they had complained to his girlfriend about him. *See Jamea*, 2022 WL 1555938, at *1–2; *Jamea*, 2024 WL 4542814, at *3. The state charges were consolidated into a single case and proceeded to trial. *See Jamea*, 2022 WL 1555938, at *1.

Those state proceedings delayed Jamea's arraignment on the federal charges. Despite the prosecution obtaining orders compelling his attendance in Pittsburgh for an arraignment, Ohio officials refused to relinquish him from state custody due to the seriousness of his state charges.

On March 17, 2020, an Ohio jury found Jamea guilty on all eight counts, and three months later, he was sentenced to prison for 35 to 38.5 years. *See Jamea*, 2024 WL 4542814, at *3. But his arraignment on the federal charges did not occur promptly afterward. By then, due to the Covid-19 pandemic, Ohio was not transporting prisoners, and Jamea declined to be arraigned by video teleconferencing.

About three years later, after the United States successfully moved for a writ of habeas corpus *ad prosequendum*, Jamea was transferred to federal custody. At his

---

[3] A superseding indictment returned on March 10, 2020, charged Jamea with seven counts: one count of conspiracy to commit armed pharmacy robbery, *see* 18 U.S.C. § 2118(d); one count of conspiracy to distribute and possess with intent to distribute controlled substances, *see* 21 U.S.C. § 846; four counts of armed pharmacy robbery, *see* 18 U.S.C. § 2118(a), (c); and one count of pharmacy robbery, *see* 18 U.S.C. § 2118(a).

arraignment in Pittsburgh on March 29, 2023, he pleaded not guilty, and his court-appointed counsel obtained an extension for pretrial motions.

Within three months, on June 15, 2023, Jamea requested new counsel. After confirming that Jamea understood that the appointment of new counsel would delay trial and that he would need to show good cause if he sought new counsel again, the District Judge granted his request. The District Judge also explained to Jamea that he typically allows a defendant "one new counsel" but generally not another absent "unusual circumstances." Aug. 23, 2023, Status Conference Tr. 6:16–18 (App. 118). New counsel was appointed on August 23, 2023, and a trial date was set for March 18, 2024.

After receiving several extensions, Jamea's new counsel filed multiple pretrial motions. One of those sought to suppress the information obtained from Jamea's iPhone 7 on the grounds that the affidavit in support of the search warrant contained a materially false statement: it attributed the text message with the address of the Vienna Rite Aid pharmacy to Jamea's iPhone 7 when the message came from another source. *See* Fed. R. Crim. P. 41(h). Although the District Court interpreted this motion as also requesting a *Franks* hearing to ascertain whether the misrepresentation was made knowingly or with reckless disregard for the truth, it denied the suppression motion without holding a hearing because it concluded that probable cause to search Jamea's iPhone 7 existed even without the allegations in Paragraph 26 of the supporting affidavit. In another pretrial motion, Jamea sought to dismiss the indictment with prejudice due to a violation of his Sixth Amendment right to a speedy trial. After considering the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), and determining that only one of them – length of delay – favored dismissal, the District Court denied that motion.

6

Within three months of the appointment of his second counsel, Jamea began writing letters to the District Judge expressing dissatisfaction with that attorney. The District Court docketed and acknowledged that correspondence, which expressed concerns primarily about pretrial discovery and pressure from his attorney to plead guilty. The District Court viewed Jamea's request as stemming from a disagreement over legal strategy and trial management, and it determined that Jamea had not established the good cause needed for appointment of subsequent counsel.

Two weeks before trial, at the preliminary pretrial conference, on March 5, 2024, Jamea announced that he wanted to proceed *pro se*. The District Court then commenced a colloquy with Jamea, *see generally Faretta v. California*, 422 U.S. 806, 835 (1975), during which he asked for a legal aide and repeatedly refused to give a yes-or-no answer to straightforward questions. After the District Court reminded him of the upcoming trial date and denied his request to submit more motions, Jamea backed off, stating "if I'm not able to file my own motions or do anything, I don't want to proceed pro se," Prelim. Pretrial Conference Tr. 48:24–25 (App. 219), and "I can't represent myself in 13 days for trial," *id.* at 51:2–3 (App. 222). The District Court then denied Jamea's request to represent himself.

The trial took place as scheduled and lasted four days. The jury returned a guilty verdict. At a subsequent hearing, the District Court sentenced Jamea to a 210-month prison term to run consecutively with his Ohio sentence of 35 to 38.5 years.

Through a notice of appeal, Jamea invoked this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291. He now challenges four pretrial rulings: the denials of his motion to suppress the information obtained from his iPhone 7 and of his motion to dismiss on speedy trial grounds, as well as the refusals of his requests for a third court-appointed counsel and to proceed *pro se*.

7

**A. The Challenge to the Denial of the Suppression Motion without a *Franks* Hearing**

Jamea argues that the District Court erred in denying his motion to suppress the search of his iPhone 7 without holding a *Franks* hearing. But not every challenge to an affidavit in support of a warrant requires an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Rather, to qualify for a *Franks* hearing, a movant must make three substantial preliminary showings: (i) that the affidavit in support of the warrant contained a false statement; (ii) that the false statement was material, meaning it was necessary for a probable cause determination, such that without the statement, there would not be probable cause; and (iii) that the false statement was made knowingly and intentionally or with reckless disregard for its truthfulness. *See id.*; *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022).

There is no dispute that Jamea made the first of those substantial showings. Paragraph 26 incorrectly identified Jamea's iPhone 7 as the phone that texted the address of the robbed pharmacy in West Virginia.

Jamea, however, falls short of making the substantial showing needed for the second prong, materiality. It is true that without Paragraph 26 in the affidavit, there would be no other direct link between the iPhone 7 and the pharmacy robberies. But the remainder of the affidavit provides sufficient probable cause to search the iPhone 7, which was recovered from Jamea upon his arrest for the shooting in Columbus. The affidavit recounts that Jamea coordinated and participated in several pharmacy robberies close in time to his arrest in Columbus and that he was seen using a cell phone at the scene of one of the crimes, so it is probable that the phone recovered upon his arrest would have information related to his coordination of and participation in those robberies. *See Illinois v. Gates*, 462 U.S.

213, 238 (1983) (explaining that probable cause exists for a search when there is a "fair probability that contraband or evidence of a crime will be found in a particular place"). Thus, because Jamea did not make a substantial showing that Paragraph 26 was necessary for a finding of probable cause to search the iPhone 7, the District Court did not err in denying the motion without holding a *Franks* hearing.

**B. The Sixth Amendment Challenge to the Denial of a Speedy Trial**

Jamea disputes the denial of his motion to dismiss the indictment on speedy trial grounds. *See generally* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). Four factors guide the determination of whether an indictment should be dismissed on speedy trial grounds: (i) the length of the delay; (ii) the reasons and relative responsibility of the parties for the delay; (iii) the timeliness of the defendant's assertion of his right; and (iv) the prejudice to the defendant. *See Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker*, 407 U.S. at 530.

*1. Length of Delay*

The first factor – length of delay – must be established before the four factors may be balanced against one another. *See Doggett*, 505 U.S. at 651–52 (treating length of delay as "a double enquiry" requiring a showing of presumptively prejudicial delay before consideration of the other three factors); *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) ("[A] court first decides whether the delay is long enough that it should trigger analysis of other *Barker* factors." (citing *Doggett*, 505 U.S. at 652)). This Court has further held that a delay of 45 months or longer satisfies the first factor. *See United States v. Battis*, 589 F.3d 673, 683 (3d Cir. 2009). So, with a delay of 57 months from the original indictment (June 11, 2019) to the scheduled trial date (March 18, 2024), Jamea

made the requisite showing for the first factor. *See United States v. Claxton*, 766 F.3d 280, 294 (3d Cir. 2014) (explaining that delay is measured "from the date of arrest or indictment, whichever is earlier, until the start of trial" (quoting *Battis*, 589 F.3d at 678)); *see also Battis*, 589 F.3d at 679 n.5 (measuring delay from the date of the original indictment for a defendant who was subject to both an original and a superseding indictment). Consequently, he demonstrated the "presumptive prejudice" needed to consider the remaining three factors. *Doggett*, 505 U.S. at 652 n.1 (using the term 'presumptive prejudice' as referring to the "point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry").

2. *The Assignment of Blame for the Delay*

Under the second factor – the assignment of blame for the delay – the periods of delay are evaluated separately based on the cause for the delay. Here, there are four periods of delay.

The first period occurred between the original and superseding indictments, June 2019 to March 2020. This delay was caused primarily by Ohio's determination that it would not release Jamea to federal custody while state proceedings were ongoing. The prosecution tried to overcome that obstacle by obtaining writs of habeas corpus *ad prosequendum* and an order granting its motion to compel attendance and enforce the writ, but Jamea was not brought in for arraignment. *Cf. Battis*, 589 F.3d at 680 (3d Cir. 2009) (finding that an *intentional* failure to bring a defendant to trial to allow state proceedings counted against the government). That delay cannot be blamed on the prosecution – at least to any significant degree.

The second period of delay, from the superseding indictment in March 2020 through September 2021, was largely due to Covid-19 policies. The Governor of Ohio declared a

state of emergency and ordered all inmates to be held in place until June 2021, and the District Court for the Western District of Pennsylvania continued all but a limited number of jury trials. A global pandemic, the declaration of a state of emergency, and the near-wholesale closure of a federal courthouse cannot be blamed on the prosecution. *See Claxton*, 766 F.3d at 294 ("[V]alid reason[s], such as a missing witness, . . . justify appropriate delay." (quoting *Battis*, 589 F.3d at 679)). That is especially so since during that time period, Jamea had successfully continued his arraignment twice and was unwilling to appear for his arraignment by video or telephone.

The third period of delay, between the resumption of trials in October 2021 and Jamea's arraignment in March 2023, was caused by Jamea's co-defendants. They obtained multiple continuances. That delay is likewise not attributable to the prosecution. *See id.*

Finally, the delay between Jamea's arraignment in March 2023 and trial in March 2024 was primarily attributable to Jamea. He filed four motions to extend the deadline to file pretrial motions, which pushed the deadline to January 31, 2024. He also requested to change counsel after acknowledging that it would lead to further delay. This period of the delay is thus attributable to Jamea. *See id.* ("[D]elay caused by the defense weighs against the defendant." (quoting *Battis*, 589 F.3d at 679–80)).

In sum, little, if any, of the delay can be attributed to the prosecution, and Jamea was responsible for at least a year of delay. Jamea is more to blame for the delay than the prosecution.

### 3. The Defendant's Assertion (or Not) of the Right

A defendant's assertion of his right to a speedy trial provides evidence that his right was being deprived, while "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Battis*, 589 F.3d at 680–81 (quoting *Barker*,

11

407 U.S. at 531–32). Here, Jamea did not assert his speedy trial rights until a June 2023 status report, four years after his indictment, and he did not file a motion asserting this right until January 2024. Jamea concedes that this factor weighs against him.

### 4. *Prejudice to the Defendant*

For the fourth factor – prejudice to the defendant – the Supreme Court has identified three, non-exhaustive types of qualifying prejudice: (i) oppressive pretrial incarceration; (ii) anxiety of the accused; and (iii) impairment of a defense "by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654. But Jamea does not allege oppressive pretrial incarceration (he was separately incarcerated on the Ohio charges). And the second form of prejudice – anxiety of the accused – principally concerns the anxiety associated with the practical consequences of "public scorn," such as the deprivation of employment and the curtailment of speech and associations. *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967).[4] Thus, this factor applies almost exclusively to persons outside of pretrial custody, and that does not include Jamea. The only remaining form of recognized prejudice is the impairment of a defense, and Jamea does not "argue []or provide evidence" on that point. *United States v. Chu*, 99 F.4th 610, 615 (3d Cir. 2024). Instead, he contends that the length of the delay was presumptively prejudicial. But as used by the Supreme Court in this context, "presumptive prejudice" from a delay means that the remaining three *Barker* factors should be considered – not that the fourth factor is

---

[4] The only circumstance in which the Supreme Court has recognized anxiety of the accused as potentially prejudicial to an already incarcerated defendant occurs when the defendant is left "with little inclination toward self-improvement," but even such a showing – which Jamea does not make – is not enough by itself to establish prejudice. *Smith v. Hooey*, 393 U.S. 374, 379 (1969) (quoting James V. Bennett, *The Last Full Ounce*, 23 Fed. Prob. 20, 21 (1959)).

presumptively satisfied. *Doggett*, 505 U.S. at 652 n.1. Under these circumstances, therefore, Jamea has not established prejudice.

Upon consideration of these factors, the District Court did not err in denying Jamea's motion to dismiss the indictment on Sixth Amendment grounds.

## C. The Challenge to the Denial of Jamea's Request for a Third Court-Appointed Attorney

Jamea also argues that the District Court erred in denying his request for a third court-appointed counsel. Specifically, he contends that the District Court did not apply the good-cause standard and that there was good cause for substituting counsel due to a complete breakdown of communication and an irreconcilable conflict.

A good-cause standard governs a criminal defendant's request for a new court-appointed attorney. *See United States v. Welty*, 674 F.2d 185, 188 (3d Cir. 1982). Jamea insists that instead of that standard, the District Court used its own policy of permitting one new counsel as of right but not allowing subsequent appointments absent unusual circumstances. Yet, it is entirely consistent with good-cause principles to consider the procedural history of a case and any prior requests for new counsel such that good cause may be easier to show for initial requests than for successive requests. *See Martel v. Clair*, 565 U.S. 648, 663 (2012) (explaining that evaluation of requests for new court-appointed counsel involve "a peculiarly context-specific inquiry"); *cf. United States v. Goldberg*, 67 F.3d 1092, 1098 (3d Cir. 1995) (describing "countervailing governmental interests" that are "relevant to the 'good cause' analysis"). Likewise, it is natural to expect good cause to be progressively harder to demonstrate as a case proceeds: over time, court-appointed counsel invests more deeply in the case, and case management delays become more impactful on the court and the parties. *Cf. Welty*, 674 F.2d at 187; *United States v. Senke*, 986 F.3d 300, 309 (3d Cir. 2021). But apart from any pragmatic considerations, the

13

District Court was explicit that its denial of Jamea's request was grounded in "good cause" based on its finding that the conflicts between him and his counsel related to legal strategy and trial management as well as Jamea's "displeasure with his attorney's assessment of his case." Mem. Order 5 (App. 58).

Jamea disputes that determination, and his list of grievances with his counsel's performance is long. He complains that his attorney did not contact him for several months; missed the first status conference; remarked that Jamea had sent an abundance of 'missives' to the court; requested that the prosecutor quit affording Jamea extensions; called Jamea a 'difficult client'; stated that Jamea did not need to like or trust him as his attorney; filed a motion to suppress out of time (that was still considered by the District Court); pressured Jamea to plead guilty; and did not comply with Jamea's requests for investigations and discovery. But a district court's good-cause determination, which involves not only credibility assessments but also an awareness of the arc of the case's progression and the context of events, is subject to a highly deferential abuse-of-discretion standard of review. *See Martel*, 565 U.S. at 663–64 ("Because a trial court's decision on substitution is so fact-specific, it deserves deference; a reviewing court may overturn it only for an abuse of discretion."); *cf. United States v. Noble*, 42 F.4th 346, 351 (3d Cir. 2022). Under that standard, no item on Jamea's grievance list is entitled to a presumption of truthfulness, and from that perspective, nothing on that list, either individually or in the aggregate, compels the conclusion that the District Court erred in denying his request for the appointment of a third court-appointed counsel.

## D. The Challenge to the Denial of Jamea's Request to Represent Himself

After the District Court denied Jamea's second request for new counsel, Jamea indicated at the preliminary pretrial conference that he wanted to represent himself at trial

14

by saying, "I want to go *pro se*." Prelim. Pretrial Conference Tr. 30:22–23 (App. 201). The District Court denied that request, and Jamea now disputes that ruling and seeks a new trial.

A request to proceed *pro se* by a criminal defendant represented by counsel is not self-executing; it requires court approval. *See United States v. Peppers*, 302 F.3d 120, 131 (3d Cir. 2002) (citing *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938)). Before a court can grant such approval, it must be satisfied that the criminal defendant is "aware of the dangers and disadvantages" of self-representation, *Faretta*, 422 U.S. at 835 (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)); demonstrates a minimal level of mental competency "to conduct trial proceedings," *Indiana v. Edwards*, 554 U.S. 164, 178 (2008); and chooses self-representation "knowing[ly], voluntar[ily], and intelligent[ly]," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).

To evaluate those considerations, the District Court commenced a colloquy with Jamea. *See Faretta*, 422 U.S. at 835. During that back-and-forth, and especially after the denial of an extension of the deadline for pretrial motions, the certainty of Jamea's request dissipated. In his own words, "if I'm not able to file my own motions[,] . . . I don't want to proceed *pro se*." Prelim. Pretrial Conference Tr. 48:24–25 (App. 219). Thus, in light of his responses during the colloquy, Jamea did not make a clear and unequivocal request to represent himself, and accordingly, he is not entitled to a new trial on that basis.

## CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.